FILED
2016 OCT -6 A 9:48
CIVIL
DISTRICT COURT

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

## STATE OF LOUISIANA

NO: 2016-9959     DIVISION: " "  C-10

### KONSTANTIN NIKOLAEV

### VERSUS

### RAYMOND BALLARD, LLC "ALTERNATIVE", AND EUCLA INVESTMENTS LIMITED

FILED :_____    DY CLERK :_____

### ORIGINAL PETITION FOR DAMAGES, DECLARATORY JUDGMENT, FRAUD, BREACH OF FIDUCIARY DUTY, AND DETERIMENTAL RELIANCE

**NOW INTO COURT**, comes Konstantin Nikolaev ("Plaintiff"), who petitions this Honorable Court for relief as follows:

1.

Made plaintiff herein is:

**KONSTANTIN NIKOLAEV** (hereinafter "Plaintiff"), a foreign citizen who invested millions of dollars into the State of Louisiana in 2013, and later deposited and guaranteed millions of dollars being held in a bank account in New Orleans Louisiana for the benefit of an oil and gas startup company (hereinafter 'Project Company").

2.

Made defendants herein are:

A. **RAYMOND BALLARD**, domiciled in New Orleans Louisiana, was hired as the Chief Financial officer to oversee funds deposited and guaranteed by Plaintiff in the New Orleans Louisiana bank account, and became the CFO of the Project Company;

B. **EUCLA INVESTMENTS LIMITED** (hereinafter "Eucla"), a foreign company organized by two Principals who are citizens of the Russian Federation who formed the Project Company with the main office in New Orleans, Louisiana, and who provided a loan to a company owned in part by Plaintiff, which loan was guaranteed by Plaintiff, and the proceeds from such loan were deposited in the Project Company's bank in New Orleans, Louisiana.

C. **LLC "ALTERNATIVE"**, a limited liability organized by two Principals who set up Eucla, formed the Project Company with the main office in New Orleans, Louisiana, and who also provided funds into the Project Company's bank in the New Orleans, Louisiana.

1

Exhibit "D"

FILED

2016 OCT -6 A 9: 40

CIVIL
DISTRICT COURT

## FACTS OF JURISDICTION AND VENUE

3.

Jurisdiction and venue are proper in the location of the residence of one of the co-conspirators, Raymond Ballard, in Orleans Parish. The nexus of the project began in New Orleans Louisiana, the parties traveled and negotiated terms in Louisiana, the Project Company opened and continued to have offices in New Orleans, was run by executives from New Orleans Louisiana, and concerns money taken without proper authority from a bank in New Orleans.

4.

In 2013, Plaintiff began studying the oil and gas infrastructure in Louisiana. In 2013 plaintiff traveled to Louisiana and met with Governor Bobby Jindal, a businessman from New Orleans, and several other Louisiana State politicians regarding the Plaintiff's intent to invest into Louisiana state infrastructure.

5.

In 2013, at a meeting on St. Charles Avenue in New Orleans, Plaintiff met with several Louisiana businessmen, a Parish President from the State of Louisiana, and several Louisiana state officials regarding investment into Louisiana. At this meeting, Plaintiff learned of a location in Louisiana that was suitable for an opportunity to develop an oil and gas infrastructure project in Louisiana.

6.

Subsequent to that meeting in New Orleans Louisiana, Plaintiff (along with others) set up a Louisiana company called Lafert, LLC ("Lafert"), with an office on Canal Street in New Orleans, hired a CEO, a resident of New Orleans, and hired a CFO, Ray Ballard, also a resident of New Orleans, Louisiana, and hired three additional engineers and executive assistants from Louisiana. During the next year, through this Louisiana investment, Plaintiff (along with others) positioned Lafert to secure a strategic location for an oil and gas infrastructure project in Louisiana. As a direct result of the millions of dollars of engineering work in the State of Louisiana, and studying the infrastructure of the Louisiana project, Plaintiff discovered a new opportunity to invest in the downstream oil and gas infrastructure associated with the American Shale Revolution (hereinafter the "Project").

2

7.

In late 2013, principals of defendants, LLC Alternative and Eucla, were informed that Plaintiff had assets in Louisiana, and that through this investment, Lafert had discovered a new opportunity to invest in the downstream infrastructure associated with the shale revolution of the United States. These principals received confidential information from Plaintiff and his associates regarding the Project. Plaintiff, through his joint shareholders and associates, sent several confidential documents from New Orleans, Louisiana to the principals of LLC Alternative and Eucla.

8.

Based upon the confidential information received, the principals of LLC Alternative and Eucla, agreed to travel to New Orleans Louisiana to review the information that Plaintiff had developed in New Orleans, Louisiana, and agreed to negotiate a deal with Plaintiff's joint shareholders, including a resident of New Orleans.

9.

On January 21, 2014, one of the principals of LLC Alternative arranged to have his private plane fly him, several of his executives, and the second principle of LLC Alternative and Eucla from London to New Orleans to receive the Project information, and to meet and negotiate with several Louisiana state government officials regarding tax incentives for their intended investment into Louisiana.

10.

On January 22, 2014, the principals of LLC Alternative and Eucla, met with several executives of Plaintiff's company in their office on Canal Street in New Orleans. At that meeting, the principals of Defendants LLC Alternative and Eucla were shown the detailed confidential information regarding market analysis of the US Shale revolution, and were shown detailed maps of Louisiana, and the location that Plaintiff had secured for the Project.

11.

The importance of this Project to the State of Louisiana was deemed significant by the officials representing the State of Louisiana. Several high level Louisiana state executives and elected officials traveled from Baton Rouge to New Orleans to meet the principals of LLC

Alternative. The Louisiana state delegation met several representatives of the project, and advanced requests for the project to receive Louisiana state tax incentives, including the Louisiana Fast Start Program, and Louisiana State economic incentives for major projects. At the meeting in New Orleans, principals of LLC Alternative and Eucla participated in the discussions regarding the investment into Louisiana, and how they could receive over 100 million dollars from the State of Louisiana in tax incentives.

12.

On January 22, 2014, the principals of LLC Alternative, and Plaintiff (along with others) met for a dinner meeting on St. Charles Avenue, and continued to discuss and negotiate terms of the deal. The connection to the state of Louisiana was so significant for the State of Louisiana, that the senior US Senator of Louisiana traveled to New Orleans for this meeting and discussed the potential investment personally with the principals of LLC Alternative and Eucla for several hours.

13.

The meetings in New Orleans resulted in a deal, whereby the principals of LLC Alternative and Eucla, agreed to invest into the Project, and jointly invest into a new company to pursue the Project (hereinafter, the "Project Company").

14.

Subsequently, the principals of LLC Alternative and Eucla spent months sending and receiving documentation to and from New Orleans, Louisiana to set up the Project Company.

15.

The principals of LLC Alternative and Eucla, at some stage sent an organizational chart to New Orleans, Louisiana indicating that they wished to own and control the Project through a holding company. It was clear from this chart that the holding company was nothing other than a holding company for the principals themselves. The organizational chart had a placeholder for the holding company of the principals listed as "LLC Alternative." LLC Alternative became the official name of this company evidencing that this company was merely a holding company of its principals.

16.

The Project Company negotiated to purchase the assets developed by Lafert in Louisiana for the Project, including rights to Louisiana land on the Mississippi river, which were paid for by capital invested by Plaintiff. The Project Company was formed through a document exchanged to and from New Orleans, and Plaintiff agreed to allow his assets developed in Louisiana for the project (including rights to Louisiana land on the Mississippi river) to be sold to the Project Company that was owned in part by the principals of LLC Alternative and Eucla.

17.

Principals of LLC Alternative and Eucla, further agreed that, since the Project had a significant connection to New Orleans, the executives running the Project should also be based in New Orleans, Louisiana. The principals of LLC Alternative agreed to hire for the Project Company, a CEO from New Orleans, and a CFO from New Orleans. Prior to hiring two executives from New Orleans, Principals of LLC Alternative and Eucla flew those executives from New Orleans to London for an in person interview, and then flew them back to New Orleans the next day.

18.

Subsequent to the establishment of the Project Company, principals of LLC Alternative and Eucla agreed that, since the project was expected to be centered in Louisiana, the Project Company should take over Plaintiff's New Orleans office and operate from that same New Orleans office.

19.

Due to the significant connection of LLC Alternative and Eucla's intended investment into New Orleans and the State of Louisiana, LLC Alternative and Eucla agreed to use a local New Orleans bank, First NBC, to provide banking services for the Project Company, and later participated in the wiring of $50 million dollars of startup capital into the Project Company's account at such New Orleans bank.

20.

After the formation of the Project Company, the agents of LLC Alternative and Eucla regularly sent correspondence to and from the Project Company offices in New Orleans.

21.

Later, LLC Alternative and Eucla, clandestinely negotiated with other shareholders of the Project Company, to withdraw more than $6 million dollars from this New Orleans bank account in direct violation for the Project Company's operating agreement. To accomplish this, LLC Alternative and Eucla clandestinely participated with other shareholders and a resident of New Orleans, the CFO of the Project Company, Ray Ballard, to make an unauthorized withdrawal from the bank in New Orleans of over $6 million dollars, which funds were ultimately paid to LLC Alternative.

## FACTS

22.

Plaintiff is the beneficial partial owner of the Project Company that is owned in part by defendant, LLC Alternative and others.

23.

Plaintiff (through a holding company ("Holdco") and LLC Alternative each contributed initial capital contributions to the Project Company in the amounts of $23.5 million and $25 million, respectively.

24.

In order to make its initial capital contribution to the Company, Holdco borrowed funds ($18.5 Million) from Eucla.

25.

Upon information and belief, Eucla is comprised of the identical principals of LLC Alternative, and is under common control with LLC Alternative.

26.

Plaintiff is a guarantor of the loan from Eucla to Holdco.

27.

At some point in 2015, LLC Alternative wanted to withdraw its initial capital contribution from the Project Company. However, the governing documents of the Project Company don't allow for any such withdrawal of a capital contribution.

28.

In order to force the other members of the Project Company to return funds to LLC Alternative, the representatives of LLC Alternative threatened to shut down the Project Company and cause substantial losses to the other members of the Project Company (including Holdco which is owned by Plaintiff and its other members). LLC Alternative convinced two minority shareholders of the Project Company to buy some of its membership units in the Project Company, using the funds held by the Project Company. This was, in effect, a clear attempt to accomplish the very withdrawal of a capital contribution that is expressly prohibited in the Project Company's organizational documents.

29.

Upon information and belief, defendant Raymond Ballard ("Ballard"), the CFO for the Project Company, transferred over $6 million dollars from the Project Company account in New Orleans to the minority shareholders for the benefit of LLC Alternative. Such transfer was done without proper authorization, and in violation of the Project Company's organizational documents.

30.

Plaintiff agreed to invest and guarantee tens of millions of dollars in the New Orleans account on the condition that the CFO Ballard would follow the Project Company Operating Agreement. The Project Company Operating Agreement strictly controls the spending and encumbrance of the funds invested and guaranteed by Plaintiff.

31.

CFO Ballard was granted access to the bank accounts and granted access to control over $50 million dollars of Project Company funds in the New Orleans account. Ballard was given this ability on the strict condition and agreement that he follow the Project Company Operating Agreement which contains very specific rules and restrictions for the use of funds.

32.

Before any of the funds in the Project Company could be touched, the Project Company Operating Agreement obligated Ballard to present an itemized and detailed annual budget which had to be board approved each year. Ballard knew he could only use funds in the New Orleans account for expenditures in conformity with the approved annual budget.

33.

CFO Ballard was specifically aware that the $6.2 million dollar purchase of shares of LLC Alternative violated the approved annual budget and was never authorized by the board. Ballard knew moving such funds would violate his specific obligations and authority outlined in the Project Company Operating Agreement and would damage shareholders such as Plaintiff. Ballard violated his duty to the Project Company and violated the Operating Agreement by wiring out $6.2 million dollars from the Project Company account in New Orleans to a bank account for the minority shareholders to purchase LLC Alternative stock. This action violated his obligations under the Project Operating Agreement and two additional sections of the Project Company Operating Agreement.

34.

Regardless of the self-dealing breach of fiduciary duty and misdeeds of the other defendants, LLC Alternative, the principals of LLC Alternative, Eucla, and other minority shareholders, Ballard as CFO in his New Orleans office was the Project Company's first and last line of defense to prevent the misappropriation of funds from the New Orleans account. Plaintiff's investment and guarantee of company was compromised and damaged through the willful misconduct of Ballard in New Orleans who followed the misdeeds of the remaining defendants and gave the bank and order to wire $6.2 million dollars out of the Project Company account for the ultimate benefit of LLC Alternative.

35.

Upon information and belief, the actions of defendant Ballard, LLC Alternative, Eucla, and others were part of a civil conspiracy to improperly transfer funds from the Company to the LLC Alternative.

36.

Thereafter, Eucla sent a notice to Plaintiff that it was calling the guaranty on the loan to Holdco that was guaranteed by Plaintiff.

37.

LLC Alternative attempted to shut down the Project Company, and to withdraw funds from the Project Company for its own benefit.

8

38.

In order to prevent the losses that would result from a dissolution of the Project Company, the managers of the Project Company were coerced by the principals of LLC Alternative to transfer over $6 million from the Project Company to, or for the benefit of, the principals of LLC Alternative.

39.

In 2014, LLC Alternative, Plaintiff and other shareholders entered into an LLC Agreement regarding the management and operation of the Project Company.

40.

In December, 2015, LLC Alternative clandestinely told two members of the Project Company that LLC Alternative wanted to shut down the Project Company, and withdraw the remaining funds from the New Orleans bank account. Shutting down the Project Company would have caused significant and disproportionate loses to the members of the Project Company, in particular Plaintiff who had loaned over $5 million dollars to Holdco to invest into the Project Company in New Orleans, and had guaranteed over $18 million dollars that was loaned to Holdco by Eucla, also for investment into the Project Company in New Orleans.

41.

LLC Alternative clandestinely negotiated to sell all of its ownership interest in the Project Company to two managers of the Project Company (that were also members of Holdco). Plaintiff was not informed of the details of this transaction, despite being a major guarantor of the investment funds in the Project Company.

42.

The agreement made between LLC Alternative and these minority owners was in conflict with two essential terms of the Project Company Operating Agreement upon which Plaintiff relied upon prior to agreeing to invest funds into the New Orleans bank about for the benefit of the Project Company. First, the transfer violated the very first paragraph of the Project Company's LLC Agreement. This section was so important it was placed on the Front Cover:

> *The Units referred to in this amended and restated limited liability company agreement are subject to the provisions of such*

9

> *agreement. No Transfer, sale, assignment, pledge, hypothecation or other disposition of the Units referred to in this amended and restated limited liability company agreement may be made except in accordance with the provisions of such agreement.*

43.

Article IX Transfer, Section 9.1-9.6 of the Project Company Operating Agreement prohibited the transfer contemplated. The parties to this transfer agreement knew this agreement conflicted with Section 9 of the Operating Agreement, and so they negotiated a "waiver" of Section 9 without any notice to Plaintiff, who personally backed a note for a pro rata share of half of the capital of the Project Company. LLC Alternative conspired with executives in New Orleans, including New Orleans resident CFO Ray Ballard to wire $6,300,000.00 from the New Orleans bank account to defendant LLC Alternative. The improper removal of these funds from the Project Company's New Orleans bank account depleted the 5.1 Initial Capital Contribution, and violated Section 5.5 of the LLC Agreement, a critical term that Plaintiff relied upon when he guaranteed a portion of the 5.1 Initial Capital Contribution. Not only was section 5.5 violated, but the Project Company's funds were used to purchase ownership units for the benefit of only a minority of the other owners of the Project Company.

44.

A depletion of 5.1 Initial Capital Contribution violated Section 5.5 of the LLC Agreement. The minority owners who participated with LLC Alternative contend that they entered into the agreement to save the Project Company after LLC Alternative advised it wanted to shut down the Project Company and withdraw the remaining 5.1 Initial Capital Contribution.

45.

Plaintiff and all defendants discussed the Project at length in New Orleans, and it was agreed that stage 1 of the project to build an Ethane export terminal would take a co-investment of $50,000,000. The parties memorialized this investment decision in the following section:

> **ARTICLE V**
> **CAPITAL CONTRIBUTIONS**
>
> **Section 5.1. *Initial Capital Contributions.*** *At the Closing, each of Amshale, AV, and Investor Member shall make its initial capital contribution ("Initial Capital Contribution") to the Company in*

*an amount, and on terms and subject to the conditions, set forth in the Unit Purchase Agreement.*

46.

Subsequent to and based upon extensive negotiations, agreements and representations, Plaintiff agreed to guarantee a portion of this investment on the understanding that these funds were necessary to be used exclusively to complete Stage 1. In addition, several board members, including Plaintiff, pledged to spend a portion of their professional time on the project without compensation. Critical to this agreement was the firm agreement memorialized in Section 5.5 stating unambiguously that the 5.1 Initial Capital Contribution could not be withdrawn once the investment was made:

> *Section 5.5. <u>No Withdrawals.</u> No Member shall be entitled to withdraw any part of its capital contribution or to receive any Distribution from the Company, except as otherwise provided herein. No Member shall receive any interest, salary or drawing with respect to its capital contributions.*

47.

Section 5.5 was an essential term of the LLC Agreement designed to prevent a party from compromising the Project Company by withdrawing the 5.1 Initial Capital Contribution.

48.

The Project Company is in the closing stages of off-take agreements for ethane that exceed the credit and revenue thresholds of the LLC Agreement. Withdrawal of the Initial Capital Contribution funds will adversely impact the Project Company.

49.

For two years, executives from New Orleans travelled nearly every corner of the globe with other Project Company board members and officers, in good faith, achieving critical milestones in reaching the Stage 1 goals. The strides they made have been monumental. These achievements were made by management, with an operational budget below the Board approved operational budget, and will likely achieve Stage 1 objectives within the 5.1 Initial Capital Contribution, exceed the revenue return threshold of Stage 1, and because of the development, will require less additional capital than contemplated in the Stage 2 investor schedule.

11

50.

A violation of Section 5.5 will likely cause a loss to Plaintiff and the other owners of the Project Company of several billion dollars in lost revenue from the loss of currently pending business opportunities. Depleting the Project Company's operating account in New Orleans by $6.3 million stripped the Project Company of critical capital needed to complete the advances listed above, and to complete stage 1 of the LLC Agreement. Prior to this taking by LLC Alternative, there was approximately $16 million left in the Project Company's account in New Orleans. The $16 million of cash in New Orleans was available cash that allowed the Project Company to operate for another two years on its current budget, which management and owners deem more than enough time to achieve the remaining steps necessary to compete Stage 1.

51.

If Stage 1 is achieved, this triggers an additional investment by LLC Alternative of $180 million. Based upon information and belief, LLC Alternative sought to prevent the triggering of the $180 million obligation. As a member of AEC with a duty of good faith and fair dealing, LLC Alternative could not lawfully take adverse steps against AEC by depleting the company of the 5.1 Initial Capital Contribution.

52.

A violation of Section 5.5 not only cripples the Project Company, but also will irreparably damage Plaintiff. The Project Company will lose their entire 5.1 Initial Capital Investment, two years of sweat equity, and billions of dollars in revenue contemplated from the ventures with several Project Company joint developers.

**FRAUD**

53.

The above and foregoing paragraphs are incorporated herein, as if stated again here.

54.

Louisiana Civil Code Article defines fraud as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.

55.

Defendants Ballard, Eucla, and Investment Member acted in concert to obtain an unjust advantage – money – by causing a direct loss to Plaintiff through a misrepresentation of an intent to improperly withdraw funds from the Project Company for the benefit of the Investment Member, and the detriment of the Plaintiff.

56.

There was no benefit to the Project Company of the actions alleged herein. The only beneficiaries of the fraudulent scheme were LLC Alternative and its owners and affiliates.

57.

With the full debt balance remaining on the loan from Eucla to Holdco, Defendant LLC Alternative defrauded Plaintiff by improperly withdrawing funds from the Project Company that would have otherwise been available for either (i) distribution to Holdco to pay its debt to Eucla, or (ii) continued operations of the Project Company that could result in substantially more in distributions to Plaintiff (through Holdco) far in excess of the debt owed to Eucla.

## UNFAIR TRADE PRACTICES

58.

The above and foregoing paragraph are incorporated herein, as if stated again here.

59.

The Louisiana Unfair Trade Practices Act (La.R.S. §51:1405, *et seq*.) prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

60.

The collaborative efforts of the Defendants to defraud Plaintiff by improperly withdrawing funds from the Project Company for the sole and exclusive benefit of LLC Alternative constitute unfair trade practices.

## BREACH OF FIDUCIARY DUTY

61.

The above and foregoing paragraphs are incorporated herein, as if stated again here.

62.

As a member of the Project Company, LLC Alternative owes a formal fiduciary duty and a duty of loyalty to the Project Company and its other members. Minority Members of the Project Company and LLC Alternative acted in bad faith to unreasonably harm the Project Company, and Plaintiff.

63.

By acting facially in its capacity as a member of the Project Company, but actually working to benefit itself, at the direct expense of Plaintiff, LLC Alternative breached its fiduciary duty and its duty of loyalty to the Company and to Plaintiff.

64.

Further, Ballard breached his fiduciary duty to Plaintiff as an officer of the Project Company by transferring over $6 million of funds from the Project Company to, or for the benefit of, LLC Alternative without proper authorization and knowingly in violation of the Project Company's LLC Agreement.

## DECLARATORY JUDGMENT TO NULLIFY STOCK SALE TO MINOTRITY OWNERS

65.

LLC Alternative induced Plaintiff to guarantee the loan to Holdco for investment into the Project Company based upon the assurance that the Project Company would operate in accordance with the Project Company's LLC Agreement. The lock up provision of the LLC Agreement of the Project Company was an essential and central cause that induced Plaintiff to both invest into the Project Company at a mutually agreed valuation of $50 million dollars, and to loan an additional $5 Million to Holdco for investment into the Project Company. The lock up provision was an essential term to any such investment by Plaintiff or any reasonable investor because the lock up provision ensured that no owners could sell ownership units at a discounted price, which could lower the agreed valuation, change ownership control, sell the ownership units at a price without a right of first refusal by Plaintiff (or Holdco), or dilute the ownership rights or valuation of Plaintiff. LLC Alternative acted clandestinely with minority owners to damage the security of Plaintiff's guarantee, which was a direct violation of the LLC Agreement, without notice to

Plaintiff and in violation of the implied duty of good faith and fair dealing to Plaintiff. LLC Alternative's improper and clandestine sale of discounted ownership units in the Project Company to a minority of owners in violation of the LLC Agreement was designed to induce the minority owners to allow LLC Alternative to improperly withdraw funds from the Project Company's New Orleans bank account in violation of the Project Company's LLC Agreement.

66.

Plaintiff is entitled to a declaratory judgment in law and equity that Defendants' actions have invalidated the guarantee of Holdco's loan from Eucla.

**DETRIMENTAL RELIANCE**

67.

LLC Alternative induced Plaintiff to guarantee the loan to Holdco for investment into the Project Company based upon the assurance that the Project Company would operate in accordance with its LLC Agreement. Plaintiff and Defendants agreed that $50 million dollars was the required budget to launch the Project Company, and the parties agreed that once one party invested in the Project Company, no party could thereafter withdraw their investment. This agreement not to withdraw was essential because, if a party was allowed to withdraw prior to the Project Company launching and achieving its specified state 1 goals, all parties would lose their investment, and this would trigger plaintiff's liability under the guarantee of the loan to Holdco for investment into the Project Company. Defendants conspired with minority owners and the Project Company's CFO in New Orleans to violate the terms of the LLC Agreement and withdraw funding in violation of the critical basis for Plaintiff's guarantee, and in violation of the Project Company's LLC Agreement. Consequently, Plaintiff in entitled to a declaratory judgment that the bad actions of LLC Alternative and others nullify Plaintiff's guarantee under the Eucla Loan Agreement, that the Defendants violated the doctrine of clean hands, or in the alternative that damages caused by the bad actions of Defendants exceed or offset that of the Plaintiff's guarantee of the loan from Eucla to Holdco.

68.

Defendants' unlawful actions, self-dealing, and actions which breached the spirit and letter of the Project Company's LLC Agreement, withdrew critical capital from the Project Company

15

which will likely cripple the Project Company's operations and cause significant damages to Plaintiff as a beneficial owner, including lost revenue, company value and future distributions from the Project Company.

69.

In the event Defendants assert that they were legally able to clandestinely negotiate with a minority of owners, and clandestinely self-deal and compromise Plaintiff's investment, Defendants are also liable to Plaintiff under the doctrine of detrimental reliance. Defendants represented to Plaintiff that if Plaintiff agreed to both guarantee a loan of $18.5 Million to Holdco from Eucla, and to loan to Holdco an additional $5 Million, all for investment into the Project Company, that Defendants would operate under the spirit and letter of the Project Company's LLC Agreement which contained critical lock up provisions and prohibitions on withdrawal of capital contributions. Plaintiff reasonably relied upon the representations of the Defendants. In the event it is held that Defendants were able to clandestinely conspire to compromise the rights of Plaintiff, and do so with impunity, Plaintiff reasonably relied upon the representations of the Defendants to his detriment, and is thus entitled to an equitable remedy under the doctrine of detrimental reliance.

Respectfully submitted,

CHEHARDY, SHERMAN, WILLIAMS,
MURRAY, RECILE, STAKELUM,
& HAYES, LLP

_____
JAMES M. WILLIAMS, (Bar No. 26141)
One Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
Telephone: 504-833-5600
Facsimile: 504-833-8080.

**PLEASE SERVE:**

Raymond Ballard

LLC "Alternative"

Eucla Investments Limited

16