*Execution Version*

---

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## OF

## AMERICAN ETHANE COMPANY, LLC

### A Texas Limited Liability Company

---

THE UNITS REFERRED TO IN THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT ARE SUBJECT TO THE PROVISIONS OF SUCH AGREEMENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REFERRED TO IN THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH AGREEMENT.

THE UNITS REFERRED TO IN THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS, AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

Exhibit "B"

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...........................................................................................................2

    Section 1.1    Definitions.................................................................................2
    Section 1.2    Interpretation ..........................................................................10

ARTICLE II ORGANIZATION.....................................................................................................11

    Section 2.1    Formation ...............................................................................11
    Section 2.2    Name .......................................................................................12
    Section 2.3    Principal Office .......................................................................12
    Section 2.4    Registered Office; Registered Agent .....................................12
    Section 2.5    Purpose; Powers; Qualifications ............................................12
    Section 2.6    Term .......................................................................................12
    Section 2.7    No State-Law Partnership .......................................................12

ARTICLE III PROJECT DEVELOPMENT, CONSTRUCTION AND FINANCING...............13

    Section 3.1    Stage 1 – Preparatory Work ...................................................13
    Section 3.2    Project Financing ...................................................................14
    Section 3.3    Surplus Land Sale ..................................................................15
    Section 3.4    Stage 2 – Construction and Commercial Operation ..............15

ARTICLE IV UNITS......................................................................................................................15

    Section 4.1    Units.......................................................................................15
    Section 4.2    Authorization and Issuance of Units......................................16
    Section 4.3    Other Issuances .....................................................................16
    Section 4.4    Certification of Units .............................................................16

ARTICLE V CAPITAL CONTRIBUTIONS..................................................................................17

    Section 5.1    Initial Capital Contributions ..................................................17
    Section 5.2    Additional Capital Contributions...........................................17
    Section 5.3    Interest; Form of Capital Contributions.................................18
    Section 5.4    Succession Upon Transfer .....................................................18
    Section 5.5    No Withdrawals ......................................................................18
    Section 5.6    Treatment of Loans From Members .......................................18

ARTICLE VI MANAGEMENT......................................................................................................18

    Section 6.1    Management of the Company .................................................18
    Section 6.2    Board Composition .................................................................18
    Section 6.3    Vacancy..................................................................................19
    Section 6.4    Removal; Resignation.............................................................20
    Section 6.5    Meetings.................................................................................20
    Section 6.6    Quorum; Manner of Acting ....................................................21

MO\164117.21

Section 6.7    Action By Written Consent.....................................................21
Section 6.8    No Employment.....................................................................21
Section 6.9    No Personal Liability ...........................................................22
Section 6.10   Board Reserved Matters........................................................22
Section 6.11   Budget....................................................................................23
Section 6.12   Deadlock.................................................................................24
Section 6.13   Other Activities; Business Opportunities...........................25
Section 6.14   Officers; Management Team ................................................26

ARTICLE VII MEMBERS...........................................................................28

Section 7.1    Admission of New Members .................................................28
Section 7.2    Representations and Warranties of Members ......................28
Section 7.3    Authority; No Personal Liability ..........................................31
Section 7.4    No Withdrawal.......................................................................31
Section 7.5    Voting .....................................................................................31
Section 7.6    Meetings..................................................................................32
Section 7.7    Quorum; Manner of Acting ..................................................32
Section 7.8    Action by Written Consent ...................................................33
Section 7.9    Member Reserved Matters....................................................33
Section 7.10   No Interest in Company Property .........................................34

ARTICLE VIII DISTRIBUTIONS................................................................34

Section 8.1    General ....................................................................................34
Section 8.2    Tax Withholding.....................................................................34
Section 8.3    Distributions in Kind.............................................................35

ARTICLE IX TRANSFER ............................................................................35

Section 9.1    Restrictions on Transfer........................................................35
Section 9.2    Permitted Transfers................................................................36
Section 9.3    Right of First Refusal ............................................................36
Section 9.4    Tag-Along Rights...................................................................38
Section 9.5    Transfers During the Lock-Up Period ..................................41
Section 9.6    Change in Control of a Member ...........................................41

ARTICLE X PREEMPTIVE RIGHTS AND REGISTRATION RIGHTS ..................41

Section 10.1   Pre-Emptive Rights................................................................41
Section 10.2   Other Pre-Emptive Rights.....................................................43
Section 10.3   Registration Rights................................................................44

ARTICLE XI EXCULPATION AND INDEMNIFICATION...................................44

Section 11.1   Exculpation of Covered Persons...........................................44
Section 11.2   Liabilities and Duties of Covered Persons...........................44
Section 11.3   Indemnification......................................................................45

MO\164117.21

Section 11.4    Survival ...................................................................................46

ARTICLE XIII ACCOUNTING; TAX MATTERS ...............................................46

Section 13.1    Financial Statements .......................................................46
Section 13.2    Inspection Rights ............................................................47
Section 13.3    Income Tax Status...........................................................47
Section 13.4    Tax Returns .....................................................................48
Section 13.5    Company Funds...............................................................48

ARTICLE XIV DISSOLUTION AND LIQUIDATION ......................................48

Section 14.1    Events of Dissolution......................................................48
Section 14.2    Effectiveness of Dissolution ..........................................48
Section 14.3    Liquidation......................................................................48
Section 14.4    Cancellation of Certificate .............................................49
Section 14.5    Survival of Rights, Duties and Obligations ....................49
Section 14.6    Recourse for Claims .......................................................50

ARTICLE XV MISCELLANEOUS.....................................................................50

Section 15.1    Expenses ..........................................................................50
Section 15.2    Further Assurances..........................................................50
Section 15.3    Confidentiality ................................................................50
Section 15.4    Notices .............................................................................51
Section 15.5    Headings ..........................................................................52
Section 15.6    Severability......................................................................52
Section 15.7    Entire Agreement ............................................................52
Section 15.8    Successors and Assigns...................................................52
Section 15.9    No Third-party Beneficiaries ..........................................52
Section 15.10   Amendment......................................................................52
Section 15.11   Waiver..............................................................................53
Section 15.12   Governing Law ................................................................53
Section 15.13   Submission to Jurisdiction ..............................................53
Section 15.14   Waiver of Jury Trial ........................................................53
Section 15.15   Equitable Remedies.........................................................54
Section 15.16   Attorneys' Fees................................................................54
Section 15.17   Remedies Cumulative ......................................................54
Section 15.18   Counterparts.....................................................................54

## SCHEDULES AND EXHIBITS

**Schedules**

| | |
|---|---|
| Schedule I | Member Schedule |
| Schedule II | Officers |
| Schedule III | Permits |

*Execution Version*

**Exhibits**

| | |
|---|---|
| Exhibit A | Joinder Agreement |
| Exhibit B | Form of LLC Interest Certificate |

iv

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

This Amended and Restated Limited Liability Company Agreement of American Ethane Company, LLC, a Texas limited liability company (the "Company"), is entered into as of April 30, 2014, by and among the Company, LLC "Alternative", a limited liability company organized under the laws of the Russian Federation (the "Investor Member"), Amshale Energy, LLC, a Texas limited liability company ("Amshale"), and Alexander S. Voloshin ("AV," together with the Company, the Investor Member, and Amshale, the "Parties," and each, individually, a "Party").

## RECITALS

WHEREAS, the Company was formed as a limited liability company pursuant to the certificate of formation of the Company filed with the Secretary of State of the State of Texas on February 24, 2014 (the "Certificate of Formation"), in accordance with the Texas Business Organizations Code (the "TBOC");

WHEREAS, the Investor Member, as the sole member of the Company, entered into a limited liability company agreement of the Company, effective February 24, 2014 (the "Initial LLC Agreement");

WHEREAS, the Parties wish to fund, finance, develop, construct, own and operate a new eight million metric ton per annum LPG production and export facility in St. James Parish, Louisiana (the "Facility") on the four hundred eighty-six (486) acres of land (more or less) and batture located in Romeville, St. James Parish, Louisiana, United States of America, commonly known as the Shady Grove Plantation, which lies between Louisiana Highway 3125 and the Mississippi River (the "Site");

WHEREAS, contemporaneously herewith, Amshale, AV, the Investor Member, and the Company are entering into a Unit Purchase Agreement ("Unit Purchase Agreement"), pursuant to which each of Amshale, AV and the Investor Member has agreed to purchase the number of Units set forth opposite its name on the Member Schedule, and the Company has agreed to issue such Units, in each case, on the terms and subject to the conditions set forth therein;

WHEREAS, upon the consummation of the transactions contemplated by the Unit Purchase Agreement (the "Closing"), each Member will own the number of Units set forth opposite its name on the Member Schedule as of the date hereof; and

WHEREAS, in connection with the foregoing, the Parties desire to amend and restate the Initial LLC Agreement in its entirety, effective as of the date upon which the Closing occurs (the "Effective Date"), (a) to effect the admission of the Management Members as Members and the issuance of the Units to the Members pursuant to the Unit Purchase Agreement, and (b) to provide, among other things, for (i) the management of the business and affairs of the Company, (ii) the allocation among the Members of the Distributions of the Company and (iii) the respective rights and obligations of the Members with respect to each other and with respect to the Company, in each case, on the terms and subject to the conditions set forth herein.

*Execution Version*

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1    Definitions.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.1:

"$" or "dollars" means United States dollars or such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts in the United States of America.

"Acceptance Notice" has the meaning set forth in Section 10.1(d).

"Additional Capital Contribution" has the meaning set forth in Section 5.2(b).

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"Affiliate Agreement" means any agreement, arrangement or understanding between the Company or any Company Subsidiary, on the one hand, and any Member or any Affiliate of a Member or any officer or employee of the Company, on the other hand, as such agreement may be amended, modified, supplemented or restated in accordance with the terms of this Agreement.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"Amshale" has the meaning set forth in the preamble of this Agreement.

"Amshale LA" means Amshale Louisiana LPG, LLC, a Louisiana limited liability company and wholly-owned subsidiary of Amshale.

"Anticipated Project Costs" means the aggregate costs required to design, engineer, permit, construct, commission and achieve commercial operations of the Project, including, without duplication, payments incurred on or on behalf of the Company under all Project Agreements, costs of the services of all consultants and other advisors in connection with the implementation of the Project and the aggregate of all expenditures for all items contained in any Approved Budget, in an amount currently anticipated not to exceed (i) $500,000,000 if the Pipeline is not constructed and (ii) $700,000,000 if the Pipeline is constructed.

2

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Approved Budget" has the meaning set forth in Section 6.11(a).

"Asset Purchase Agreement" means that certain Asset Purchase Agreement to be entered into by and between the Company and Amshale LA for the acquisition of certain assets and the assumption of certain liabilities of Amshale LA by the Company in accordance with Article IV of the Bridge Loan.

"AV" has the meaning set forth in the preamble of this Agreement.

"Available Cash" means (a) all cash and cash equivalents of the Company on hand at the determination date *less* (b) any cash reserves of, or payment to third parties of, such funds necessary or appropriate to comply with Applicable Law or satisfy the reasonable business needs of the Company, in the case of each of clauses (a) and (b), as determined by the Board (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, taxes, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

"Bankruptcy" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of a sixty (60)-day period following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"Board" has the meaning set forth in Section 6.1.

"Board Approval" has the meaning set forth in Section 6.6(c).

"Bridge Loan" means that certain Bridge Loan Agreement dated March 6, 2014, pursuant to which an Affiliate of the Investor Member extended a bridge loan in the amount of $25,000,000 to Amshale LA, the proceeds of which Amshale LA is obligated thereunder to use exclusively in connection with the acquisition of the Site from Parkview Land Company, L.L.C., operating expenses of Amshale LA and to pay costs and expenses associated with the Bridge Loan, in each case, in accordance with the Stage 1 Budget as approved in accordance with the terms of the Initial LLC Agreement.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in the United States of America, the Russian Federation, the Virgin Islands or the Republic of Cyprus are authorized or required to close.

"Buy-Out Price" has the meaning set forth in Section 6.12(b).

"Buy-Sell Election Date" has the meaning set forth in Section 6.12(c).

"Buy-Sell Offer Notice" has the meaning set forth in Section 6.12(b).

"Buy-Sell Purchase Price" has the meaning set forth in Section 6.12(e).

"Certificate" has the meaning set forth in Section 4.4(b).

"Certificate of Formation" has the meaning set forth in the recitals of this Agreement.

"Chairman" has the meaning set forth in Section 6.2(c).

"Change of Control" has the meaning set forth in Section 9.6.

"Closing" has the meaning set forth in the recitals of this Agreement.

"Company" has the meaning set forth in the preamble of this Agreement.

"Company Opportunity" has the meaning set forth in Section 6.13(d).

"Company Subsidiary" means any Subsidiary of the Company.

"Confidential Information" has the meaning set forth in Section 15.3(a).

"Covered Person" has the meaning set forth in Section 11.1(a).

"Datani" means Datani Holdings Limited, a limited company incorporated under the laws of the British Virgin Islands (company registration number 1712469) whose registered office is at Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands.

"Deadlock" has the meaning set forth in Section 6.12(a).

"Development Plan" has the meaning set forth in Section 3.2(a).

"Director" has the meaning set forth in Section 6.1.

"Disability," with respect to any Person, means such Person's incapacity due to physical or mental illness that: (a) shall have prevented such Person from performing his duties for the Company or any of the Company Subsidiaries on a full-time basis for more than ninety (90) or more consecutive days or an aggregate of one hundred eighty (180) days in any three hundred sixty five (365)-day period; or (b) (i) the Board determines, in compliance with Applicable Law, is likely to prevent such Person from performing such duties for such period of time and (ii) thirty (30) days have elapsed since delivery to such Person of the determination of the Board and

such Person has not resumed such performance (in which case the date of determination of a "Disability" pursuant to this clause (b) shall be deemed to be the last day of such thirty (30)-day period).

"Distribution" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a service provider for the Company or a Company Subsidiary. "Distribute" when used as a verb shall have a correlative meaning.

"EBITDA," with respect to the Company and for any given fiscal year, shall mean its earnings from operations before interest, taxes, depreciation and amortization, determined in accordance with GAAP as consistently applied.

"Effective Date" has the meaning set forth in the recitals of this Agreement.

"Electronic Transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"Eucla" means Eucla Investments Limited, a limited company incorporated under the laws of the British Virgin Islands (company registration number 1042165) whose registered office is at Coastal Building, Wickham's Cay II, P.O. Box 2221, Road Town, Tortola, British Virgin Islands.

"Eucla Loan Agreement" means that certain Loan Agreement to be entered into by and between Amshale and Eucla, pursuant to which Eucla agrees to extend a loan in the amount of $18,750,000 to Amshale, the proceeds of which Amshale is obligated thereunder to use exclusively in connection with the acquisition of the Company Units pursuant to this Agreement and to pay costs and expenses incurred in connection with such loan.

"Eucla Pledge Agreement" means that certain Pledge Agreement by and between Amshale and Eucla, to be dated within five (5) Business Days of the first advance of the loan under the Eucla Loan Agreement, pursuant to which Amshale pledges to Eucla the equity interests that Amshale holds in the Company, constituting 47.5% of the issued and outstanding membership interests of the Company.

"Exercise Period" has the meaning set forth in Section 10.1(d).

"Exercising Member" has the meaning set forth in Section 10.1(e).

"Facility" has the meaning set forth in the recitals of this Agreement.

MO\164117.21

"Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined by the Members in accordance with Section 7.9(a)(ix).

"Fully Diluted Basis" means, as of any date of determination, (a) with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable, or (b) with respect to any specified type, class or series of Units, all issued and outstanding Units designated as such type, class or series and all such designated Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Independent Director" has the meaning set forth in Section 6.2(a)(iii).

"Initial Capital Contribution" has the meaning set forth in Section 5.1.

"Initial LLC Agreement" has the meaning set forth in the recitals of this Agreement.

"Initiating Member" has the meaning set forth in Section 6.12(b).

"Initiating Party" has the meaning set forth in Section 6.13(b).

"Investor Director" has the meaning set forth in Section 6.2(a)(i).

"Investor Member" has the meaning set forth in the preamble of this Agreement.

"Investor Representative" has the meaning set forth in Section 6.14(c).

"IPO Entity" means any newly-formed corporation or business entity (a) to which all or a substantial portion of the Company's assets or the Units are transferred or (b) into which the Company is converted, in the case of each of clauses (a) and (b), in anticipation of or otherwise in connection with an initial Public Offering such entity or its Affiliate.

"Issuance Notice" has the meaning set forth in Section 10.1(c).

"Joinder Agreement" means the joinder agreement in form and substance attached hereto as Exhibit A.

"<u>Liquidator</u>" has the meaning set forth in <u>Section 14.3(a)</u>.

"<u>Lock-Up Period</u>" means forty-two (42) months from the date of this Agreement.

"<u>Losses</u>" has the meaning set forth in <u>Section 11.3(a)</u>.

"<u>Management Director</u>" has the meaning set forth in <u>Section 6.2(a)(ii)</u>.

"<u>Management Members</u>" means, collectively, Amshale and AV.

"<u>Management Team</u>" has the meaning set forth in <u>Section 6.14(a)</u>.

"<u>Member</u>" means, (a) as of the date hereof, the Investor Member, (b) as of the Effective Date, each of the Management Members; and (c) as of the effective date of such admission, each other Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the TBOC, in each case, so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as such term is defined in the TBOC) of the Company.

"<u>Member Approval</u>" has the meaning set forth in <u>Section 7.7(c)</u>.

"<u>Member Schedule</u>" has the meaning set forth in <u>Section 4.1(b)</u>.

"<u>New Interests</u>" has the meaning set forth in <u>Section 4.3</u>.

"<u>Non-Exercising Member</u>" has the meaning set forth in <u>Section 10.1(e)</u>.

"<u>Officers</u>" has the meaning set forth in <u>Section 6.14(a)</u>.

"<u>Option Period</u>" has the meaning set forth in <u>Section 9.3(c)(ii)</u>.

"<u>Other Business</u>" has the meaning set forth in <u>Section 6.13(d)</u>.

"<u>Over-Allotment Exercise Period</u>" has the meaning set forth in <u>Section 10.1(e)</u>.

"<u>Over-Allotment Notice</u>" has the meaning set forth in <u>Section 10.1(e)</u>.

"<u>Party</u>" has the meaning set forth in the preamble of this Agreement.

"<u>Percentage Interest</u>," with respect to each Member, means a fraction, expressed as a percentage, the numerator of which shall be the number of Units held by such Member and the denominator of which shall be the total number of issued and outstanding Units held by all of the Members.

"<u>Permits</u>" has the meaning set forth in <u>Section 3.1(b)(iii)</u>.

"<u>Permitted Transfer</u>" has the meaning set forth in <u>Section 9.2</u>.

"<u>Permitted Transferee</u>" means a recipient of a Permitted Transfer.

MO\164117.21

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Pipeline" has the meaning set forth in Section 3.1(b)(ii)(F).

"Pro Rata Portion" means: (a) for purposes of Section 10.1, with respect to any Member holding Units, on any issuance date for any unissued Units or Unit Equivalents, a fraction determined by dividing (i) the number of Units on a Fully Diluted Basis owned by such Member immediately prior to such issuance by (ii) the total number of Units on a Fully Diluted Basis held by the Members on such date immediately prior to such issuance; and (b) for purposes of Section 9.3, with respect to any ROFR Rightholder holding Units, on any date of a proposed Transfer by a Selling Member, a fraction determined by dividing (i) the number of Units on a Fully Diluted Basis owned by such ROFR Rightholder immediately prior to such Transfer by (ii) the total number of Units on a Fully Diluted Basis held by the Members on such date immediately prior to such Transfer.

"Project" means the construction, development and operation of the Facility.

"Project Agreement" has the meaning set forth in Section 3.1(b)(ii).

"Project Financing" has the meaning set forth in Section 3.2(b).

"Proposed Budget" has the meaning set forth in Section 6.11(a).

"Prospective Purchaser" has the meaning set forth in Section 10.1(c).

"Public Offering" means any underwritten public offering pursuant to a registration statement filed in accordance with the Securities Act.

"Qualified Public Offering" means the closing of a firm commitment underwritten Public Offering led by a nationally recognized underwriting firm pursuant to an effective registration statement under the Securities Act: (a) covering the offer and sale of at least 25% of the total Units (or common stock of an IPO Entity) for the account of the Company, (b) offering Units (or common stock of the IPO Entity) at or above $2.00 per Unit (or the share of common stock equivalent of one (1) Unit, as applicable) and (c) in which such Units (or shares of common stock, as applicable) are listed on any national securities exchange or quoted on the NASDAQ Global Market; *provided*, that, without limiting the foregoing, in the event of an offer and sale of 25% of the total Units (or common stock of an IPO Entity), the net cash proceeds to the Company (after deducting underwriters' discounts and selling commissions and fees) shall be at least $105,000,000.

"Representative" means, with respect to any Person, any director, manager, officer, employee, consultant, financial advisor, counsel, accountant or other agent of such Person.

"Responding Member" has the meaning set forth in Section 6.12(b).

"Response Notice" has the meaning set forth in Section 6.12(c).

8

"ROFR Exercise Notice" has the meaning set forth in Section 9.3(c)(ii).

"ROFR Rightholder" has the meaning set forth in Section 9.3(a)(ii).

"Sale Units" has the meaning set forth in Section 9.3(a)(i).

"Second Project" has the meaning set forth in Section 6.13(b).

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"Sell-Out Price" has the meaning set forth in Section 6.12(b).

"Selling Member" has the meaning set forth in Section 9.3(a)(i).

"Selling Member Notice" has the meaning set forth in Section 9.3(b)(i).

"Site Acquisition Agreement" means that certain Purchase and Sale Agreement to be entered into by Lafert L.L.C. and Parkview Land Company, L.L.C. for the acquisition of the Site.

"Site" has the meaning set forth in the recitals of this Agreement.

"Stage 1" means the period commencing on Stage 1 Commencement and ending on the date that is the earlier of (a) the financial close of the Project Financing and (b) March 15, 2015, during which the first stage of the development of the Project shall be implemented and completed in accordance with Section 3.1.

"Stage 1 Budget" has the meaning set forth in Section 3.1(a).

"Stage 1 Commencement" means March 6, 2014.

"Subsidiary" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"Surplus Land" has the meaning set forth in Section 3.3.

"Tag-Along Exercise Notice" has the meaning set forth in Section 9.4(c)(ii).

"Tag-Along Exercise Period" has the meaning set forth in Section 9.4(c)(ii).

"Tag-Along Member" has the meaning set forth in Section 9.4(a).

"Tag-Along Notice" has the meaning set forth in Section 9.4(b).

"Tag-Along Portion" has the meaning set forth in Section 9.4(c)(i).

"Tag-Along Sale" has the meaning set forth in Section 9.4(a).

"<u>TBOC</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Third Party Purchaser</u>" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Units or (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Units.

"<u>Transfer</u>" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person.  "<u>Transfer</u>" when used as a noun shall have a correlative meaning. "<u>Transferor</u>" and "<u>Transferee</u>" mean a Person who makes or receives a Transfer, respectively.

"<u>Unit</u>" means a unit representing a fractional part of the limited liability company interest in the Company having the privileges, preferences, duties, liabilities, obligations and rights set forth herein, including such Member's right (a) to its share of income, gain, loss and deduction of the Company; (b) to its share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided herein; and (d) to any and all other benefits to which such Member may be entitled as provided herein or the TBOC, and such limited liability company interest represented by such Units shall be determined in accordance with such privileges, preferences, duties, liabilities, obligations and rights.

"<u>UCC</u>" has the meaning set forth in <u>Section 4.4(a)</u>.

"<u>Unit Equivalents</u>" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"<u>Unit Purchase Agreement</u>" has the meaning set forth in the recitals of this Agreement.

Section 1.2      <u>Interpretation</u>.

(a)      Any capitalized term defined in this Agreement has its defined meaning throughout this Agreement and in each Exhibit or Schedule regardless of whether it appears before or after the place where it is first defined.

(b)      For purposes of this Agreement: (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole and (iv) the word "day" means and refers to a calendar day.

(c)      The definitions given for any defined terms herein shall apply equally to both the singular and plural forms of the terms defined.

(d)      Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(e)      Unless the context otherwise requires, references herein to: (i) Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (ii) an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder; and (iv) any Person includes its successors and permitted assigns, and, in the case of any Governmental Authority, Persons succeeding to its functions and capacities.

(f)      This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

(g)      The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

(h)      Unless expressly provided to the contrary in this Agreement, any action, consent, approval, election, decision or determination to be made by any Member or the Board under or in connection with this Agreement (including any act by such Member or the Board within its "discretion" under this Agreement and the execution and delivery of any documents or agreements on behalf of the Company), shall be in the sole and absolute discretion of such Member or the Board, as applicable.

ARTICLE II
ORGANIZATION

Section 2.1    Formation.

(a)      Upon the execution, delivery and filing of the Certificate of Formation with the Secretary of State of the State of Texas in accordance with the TBOC, the Company was formed as a limited liability company thereunder.  The Investor Member ratified and approved all actions causing the Company to be formed under the TBOC, and entered into the Initial LLC Agreement, effective February 24, 2014.  This Agreement amends, restates and supersedes the Initial LLC Agreement in its entirety and shall be effective as of the Effective Date; *provided*, that if the Closing does not occur on or prior to the date that is one (1) month after the date hereof due to the failure by any of Amshale or AV to consummate the transactions contemplated by the Unit Purchase Agreement, then this Agreement shall not become effective and the Initial LLC Agreement shall remain in full force and effect as the "company agreement" of the Company as such term is used in the TBOC.

(b)      This Agreement shall constitute the "company agreement" (as such term is used in the TBOC) of the Company.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the TBOC and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the TBOC in the absence of such provision, this Agreement shall, to the extent permitted by the TBOC, control.

11

Section 2.2     Name.  The name of the Company is "American Ethane Company, LLC" or such other name or names as the Board may from time to time determine; *provided*, that the name shall always contain the phrase "limited liability company" or "limited company" or the abbreviation of one of the foregoing phrases.

Section 2.3     Principal Office.  The principal office of the Company shall be located at 365 Canal Street, Suite 2650, New Orleans, Louisiana, or at such other place as the Board may from time to time determine.  The Board shall give prompt notice to the Members of any change to the principal office of the Company.

Section 2.4     Registered Office; Registered Agent.

(a)     The registered agent of the Company for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Board may from time to time designate.

(b)     The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Board may from time to time designate.

Section 2.5     Purpose; Powers; Qualifications.

(a)     The purpose of the Company is to (i) develop, construct, own and operate the Project (ii) participate in the integrated value-chain production, sale and export of natural gas liquids from the United States and (ii) carry on any lawful business, purpose or activity necessary or incidental to the foregoing.

(b)     The Company shall have all the powers necessary or advisable to carry out the purposes for which it was formed, including powers granted under the TBOC.

(c)     On February 26, 2014, the Certificate of Authority of the Company was filed and recorded in the Office of the Secretary of State of the State of Louisiana authorizing the Company to transact business in the State of Louisiana.  The Board is authorized to cause the Company to comply with all requirements necessary to qualify or license the Company (or maintain its qualification or license) as a foreign limited liability company in the any jurisdiction in which the Company owns property or transacts business to the extent that such qualification or license is necessary or advisable, in the sole discretion of the Board, for the protection of the limited liability of the Members or to permit the Company lawfully to own property or transact business in such jurisdiction.

Section 2.6     Term.  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.7     No State-Law Partnership.  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and

that no Member, Director or Officer of the Company shall be a partner or joint venturer of any other Member, Director or Officer of the Company, for any purposes.

ARTICLE III

PROJECT DEVELOPMENT, CONSTRUCTION AND FINANCING

Section 3.1    Stage 1 – Preparatory Work.

(a)    From and after Stage 1 Commencement, the Management Team shall use best efforts to cause the Company to complete Stage 1 prior to March 15, 2015, in accordance with the itemized budget setting forth the anticipated project milestones, deliverables and work-streams, costs and expenses for the two (2) consecutive six (6)-month periods of Stage 1, as previously approved by the Board, and as may be amended, supplemented or otherwise modified from time to time in accordance with Section 6.10(a)(iii) (the "Stage 1 Budget"); *provided*, that, notwithstanding anything herein to the contrary, in no event shall the total amount of (i) the Stage 1 Budget or (ii) the Company's obligations and liabilities prior to completion of Stage 1, exceed the aggregate amount of the Initial Contributions of the Members.

(b)    During Stage 1, the Management Team shall use its best efforts to:

(i)    prepare a bankable feasibility study for the Project;

(ii)    arrange for the execution and delivery of the agreements required to commence construction and development of the Project and achieve commercial operation of the Facility in accordance with applicable Law (each, a "Project Agreement"), in each case, on terms consistent with the Project Financing requirements, including the following Project Agreements:

(A)    design, engineering, procurement and construction contracts for the production facilities portion of the Facility with the appropriate completion guarantee and defects warranty;

(B)    contracts with General Electric Company (or its Affiliates) for the purchase and installation of equipment and infrastructure for the commercial operation of the Facility with the appropriate completion and performance guarantee;

(C)    design, engineering, procurement and construction contract for the port terminal portion of the Facility with the appropriate completion guarantee and defects warranty;

(D)    gas supply contracts with counterparties acceptable to the Investor Member sufficient to meet the natural gas feedstock requirements of 100% of the design capacity of the Facility with market practice guarantees, and if a capacity reservation fee, construction fee or other prepayment is required in excess of the Approved Budget, then such fee or prepayment shall be subject to Section 6.10(a)(iv);

13

(E)     offtake agreements for the nameplate capacity of the Facility on the most favorable terms commercially available subject to <u>Section 6.10(a)(viii)</u>;

(F)     design, engineering, procurement and construction contracts for the pipeline to the Facility (the "<u>Pipeline</u>") to be constructed with customary completion and performance guarantees; and

(G)     an assignment and assumption agreement pursuant to which the Company accepts and assumes all rights and obligations of Lafert L.L.C. under the Site Acquisition Agreement;

(H)     the Asset Purchase Agreement; and

(I)     the purchase and sale agreement for the sale of Surplus Land subject to and in accordance with <u>Section 3.3</u>.

(iii)     procure the permits set forth on <u>Schedule III</u> and any other permits or licenses, franchises, registrations, filings, accreditations, variances, notices, waivers, authorizations, consents, or approvals required to commence construction and development of the Project and achieve commercial operation of the Facility in accordance with Applicable Law ("<u>Permits</u>");

*provided*, that, in any event, the Management Team shall arrange for the execution and delivery of such Project Agreements and the procurement of such Permits during Stage 1 as are necessary to obtain the Project Financing.

Section 3.2     <u>Project Financing</u>.     Prior to the commencement of Stage 2, the Management Team shall:

(a)     prepare a development plan for the implementation of the Project (the "<u>Development Plan</u>") setting forth key milestones, a schedule for achieving such milestones (including a scheduled date for achieving commercial operation of the Project), design basis and other general specification of the Project, which shall be (i) reviewed by an independent third party consultant engaged at the Company's expense, upon request and at the instruction of the Board, (ii) adopted by the Company subject to Member Approval in accordance with <u>Section 7.9(a)(x)</u>, and (iii) consistent with the following requirements:

(i)     Additional Capital Contributions during Stage 2 will not exceed $160,000,000;

(ii)     the Facility will start its operation within twenty-four (24) to thirty (30) months after Stage 1 Commencement;

(iii)     the Facility will reach designed capacity within forty-two (42) months after Stage 1 Commencement;

(iv)     the Company revenue for the first twelve (12) months following the commencement of commercial operation will be at least $2,400,000,000; and

14

(v)     EBITDA for during the first twelve (12) months following the commencement of commercial operation will be at least $900,000,000.

(b)     facilitate the completion of lender technical and commercial due diligence with the lenders' independent technical consultant engaged at the Company's expense and other due diligence as is necessary and appropriate in connection with the negotiation of a term sheet and binding credit and security documentation in connection with the debt financing of the Project by the lenders in an amount sufficient to fund seventy-percent (70%) of the Anticipated Project Costs (the "Project Financing"); and

(c)     arrange for the execution and delivery of definitive credit and security agreements (countersigned by lenders) to achieve financial close of the Project Financing prior to March, 15, 2015, on the basis of the Project with a complete and final financial model, and such Permits and Project Agreement as may be required by the lenders in such Project Financing; *provided, however*, that in no event shall any of the Members, Eucla, Datani, or any of their respective Affiliates be required to guarantee or provide any other type of credit support in connection with the Project Financing.

Section 3.3     Surplus Land Sale.  Except as otherwise determined by the Members in accordance with the Section 7.9(a)(xi), the Management Team shall use its best efforts to facilitate and arrange the sale by the Company of up to four hundred (400) acres of land in excess, if any, of the confirmed Site (the "Surplus Land") to a third-party buyer as soon as practicable, but in no event later than March 15, 2015.  As soon as practicable after the receipt of the proceeds of any such sale, the Company shall distribute $10,000,000 of such proceeds to the Members pursuant to Section 8.1, subject to a determination of Available Cash pursuant to Section 6.10(a)(i).

Section 3.4     Stage 2 – Construction and Commercial Operation.

(a)     In connection with the financial close of the Project Financing, the Members shall make Additional Capital Contributions, subject to Section 3.2(a)(i), Section 5.2(b), and Section 7.9(a)(iv), *pro rata* with any drawings under the debt financing, and, in any event in accordance with the requirements of the lenders in such Project Financing, in an amount sufficient to fund thirty-percent (30%) of the Anticipated Project Costs.

(b)     During Stage 2, the Management Team shall arrange for (i) the execution and delivery of all Project Agreements and the procurement of all Permits required to commence construction and development of the Project and achieve commercial operation of the Facility in accordance with applicable Law (to the extent not required to be executed and delivered or procured, as the case may be, during Stage 1 pursuant to Section 3.1(b)) and (ii) the construction and commencement of commercial operation of the Facility, in the case of each of clauses (i) and (ii), in accordance with the Development Plan and this Agreement.

ARTICLE IV
UNITS

Section 4.1     Units.

(a)     The limited liability company interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series in accordance with the terms and conditions of this Agreement.  The Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights set forth in this Agreement with respect to such Units.

(b)     The Company shall maintain a schedule of all Members, and the amount and type of Units held by them, their respective Percentage Interests and their respective notice addresses (the "Member Schedule"), and shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member.  A copy of the Member Schedule effective as of the Effective Date is attached hereto as Schedule I.

Section 4.2     Authorization and Issuance of Units. Subject to Section 7.9(a)(iv), Section 10.1 and Section 9.1, the Company is hereby authorized to issue an unlimited number of Units. As of the Effective Date after giving effect to the transactions contemplated by the Unit Purchase Agreement, 50,000,000 Units are issued and outstanding in the amounts set forth on the Member Schedule opposite each Member's name.

Section 4.3     Other Issuances. In addition to the Units, the Company may, subject to Section 7.9(a)(iv), Section 10.1 and Section 9.1, authorize and issue or sell to any Person (a) any new type, class or series of Units not otherwise described in this Agreement, which Units may be designated as classes or series of the preferred, common incentive units having different privileges, preferences, duties, liabilities, obligations and rights; and (b) any Unit Equivalents (clauses (a) and (b), collectively, "New Interests").

Section 4.4     Certification of Units.

(a)     Each Unit shall constitute and shall remain a "security" within the meaning of Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of Texas and of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.  Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Texas (the "UCC"), such provision of Article 8 of the UCC shall be controlling.

(b)     Upon the issuance of Units to any Person in accordance with the provisions of this Agreement, without any further act, vote or approval of any Member, Director, Officer or any Person, the Company shall issue one or more non-negotiable certificates in the name of such person substantially in the form attached hereto as Exhibit B (a "Certificate"), which evidences the ownership of the Units of such Person.  Each such Certificate shall be denominated in terms of number of Units evidenced by such Certificate and shall be signed by an Officer on behalf of the Company.

(c)     Without any further act, vote or approval of any Member, Director, Officer or any Person, the Company shall issue a new Certificate in place of any Certificate previously

16

issued if the holder of the Units represented by such Certificate, as reflected on the books and records of the Company:

        (i)     makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Certificate has been lost, stolen or destroyed;

        (ii)    requests the issuance of a new Certificate before the Company has notice that such previously issued Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

        (iii)   if requested by the Board, delivers to the Company a bond, in form and substance satisfactory to the Board, with such surety or sureties as the Board may direct, to indemnify the Company against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Certificate; and

        (iv)   satisfies any other reasonable requirements imposed by the Company.

(d)    Upon a Member's Transfer in accordance with the provisions of this Agreement of any or all of the Units represented by a Certificate, the Transferee of such Units shall deliver such Certificate to the Company for cancellation (executed by such transferee on the reverse side thereof), and the Company shall thereupon issue a new Certificate to such Transferee for the Units being transferred and, if applicable, cause to be issued to such Member a new Certificate for that number of Units that were represented by the cancelled Certificate and that are not being Transferred.

(e)    The Company shall maintain a register for the purpose of recording the Transfer or issuance of Units.  Such register shall contain each Member's name, number of Units held by it, the date of any Transfer or issuance of any Units to such Member, and the number(s) of the corresponding Certificate(s) issued and/or cancelled in connection therewith.  Notwithstanding any provision of this Agreement to the contrary, a Transfer of Units requires delivery of an endorsed Certificate and shall be effective upon recordation of such Transfer in the register of the Company.

## ARTICLE V
## CAPITAL CONTRIBUTIONS

Section 5.1    <u>Initial Capital Contributions</u>.  At the Closing, each of Amshale, AV and the Investor Member shall make its initial capital contribution ("<u>Initial Capital Contribution</u>") to the Company in an amount, and on the terms and subject to the conditions, set forth in the Unit Purchase Agreement.

Section 5.2    <u>Additional Capital Contributions</u>.

(a)    No Member shall be required to make any capital contributions to the Company in excess of its Initial Capital Contribution and no Member (or any Person which desires to become a Member) shall be permitted to make any capital contributions to the Company except in accordance with this <u>Section 5.2</u>.

MO\164117.21

(b)      The Members may make additional capital contributions in cash in such amounts and at such times as may be determined by the Board from time to time to be reasonably necessary to pay any operating, capital or other expenses relating to the Business and as shall be set forth in any Approved Budget which has been approved in accordance with Section 6.10(a)(iii) (other than the Stage 1 Budget which reflects the aggregate amount of the Initial Capital Contributions of the Members) (such additional capital contributions, the "Additional Capital Contributions"), *provided*, that, any call for Additional Capital Contributions shall be subject to Member Approval in accordance with Section 7.9(a)(iv) and shall not exceed amounts expressly approved by the Members in respect of such Additional Capital Contributions; and, *provided, further*, that, such Additional Capital Contributions may only be made in connection with an issuance of Units made in compliance with Section 10.1.

(c)      No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the payment or repayment of any capital contribution by or to any other Member.

Section 5.3      Interest; Form of Capital Contributions .  No interest shall be paid to any Member on any capital contributions.   All capital contributions shall be denominated and payable in dollars, unless otherwise determined by the Board.

Section 5.4      Succession Upon Transfer.  In the event that any Units are Transferred in accordance with the terms of this Agreement, the Transferee shall receive distributions pursuant to Article VIII and Article XIV in respect of such Units.

Section 5.5      No Withdrawals.  No Member shall be entitled to withdraw any part of its capital contribution or to receive any Distribution from the Company, except as otherwise provided herein.  No Member shall receive any interest, salary or drawing with respect to its capital contributions.

Section 5.6      Treatment of Loans From Members.   Loans by any Member to the Company shall not be considered capital contributions.

ARTICLE VI
MANAGEMENT

Section 6.1      Management of the Company.  Except as otherwise required by law or this Agreement, the board of managers of the Company (the "Board") shall have full, exclusive and complete authority to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company.  Each member of the Board (each, a "Director") shall be deemed a "manager" within the meaning of the TBOC. The Board must act as a board, and no individual Director, as such, shall have any authority to bind or act for, or assume any obligation or responsibility on behalf of, the Company unless expressly authorized to do so by action taken by the Board in accordance with this Agreement.

Section 6.2      Board Composition.

(a)      The Board shall consist of six (6) Directors:

18

(i)      one (1) Director, which shall be entitled to cast five (5) votes on all matters to be voted on by the Directors (the "Investor Director"), which shall be designated by the Investor Member for so long as the Investor Member holds any Units;

(ii)      four (4) Directors, of which three (3) Directors shall be entitled to cast one (1) vote on all matters to be voted on by the Directors and one (1) Director shall be entitled to cast two (2) votes on all matters to be voted on by the Directors (the "Management Directors"), which shall be designated by Amshale for so long as Amshale holds any Units; *provided*, that the Management Director entitled to cast two (2) votes on all matters to be voted on by the Directors shall be Michael Yuriev until such time he ceases to serve on the Board for any reason, at which time the Board shall automatically be increased to consist of seven (7) Directors (without any further action on the part of the Company or any Member), with the number of Management Directors increased from four (4) to five (5), and each Management Director shall be entitled to cast one (1) vote on all matters to be voted on by the Directors; and

(iii)      one (1) Director, which shall be entitled to cast one (1) vote on all matters to be voted on by the Directors (the "Independent Director"), which shall be AV.

(b)      Each Director (other than the Independent Director) shall serve on the Board until its, his or her resignation, removal, Disability, or death (as applicable), or until its, his or her successor shall have been duly elected and qualified; *provided*, that AV shall serve as the Independent Director until the earlier of (i) the termination of the Company, (ii) the amendment of the applicable provisions of the Initial LLC Agreement, if then in effect, or this Agreement in accordance with its respective terms to expressly provide otherwise, and (iii) his death or Disability

(c)      The Board may elect from among the Directors a chairman of the Board (the "Chairman") to preside at all meetings of the Board and to perform such duties as shall be assigned to him or her by the Board from time to time (which duties may not include any duties assigned to any officer of the Company); *provided*, that the Chairman shall not have an additional or casting vote in any deliberations of the Board.

Section 6.3      Vacancy.

(a)      In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of the Investor Director, then the Investor Member (and only the Investor Member) shall have the right to designate any Person to fill such vacancy and the Company and each Member hereby agrees to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy.

(b)      In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of any Management Director, then Amshale shall have the right to designate an individual to fill such vacancy (unless such vacancy results from the death, Disability, retirement, resignation or removal of Michael Yuriev, in which case Amshale shall have the right to designate one (1) individual to fill such vacancy plus one (1) individual to fill the vacancy which results from the newly-created directorship pursuant to

Section 6.2(a)(ii)) and the Company and each Member hereby agrees to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy; *provided*, that in the event that Amshale fails to designate in writing a representative to fill a vacant Management Director position on the Board, and such failure shall continue for more than thirty (30) days after notice from the Company to Amshale with respect to such failure, then the vacant position shall be filled by an individual designated by the vote of a majority of the Directors then in office; *provided*, that such individual shall be removed from such position if Amshale so directs and simultaneously designates a new Management Director.

(c)     In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of AV as the Independent Director, then no Member shall have the right to designate an individual to fill such vacancy and the Company and no other Person shall be elected or appointed to fill such vacancy on the Board.  From and after the date on which AV ceases to serve as the Independent Director for any reason, Section 6.12 shall apply.

Section 6.4     Removal; Resignation.

(a)     A Director (other than the Independent Director) may be removed from the Board or replaced at any time, with or without cause, upon, and only upon, the written request of the Member entitled to designated such Director pursuant to Section 6.3.

(b)     A Director may resign at any time from the Board by delivering a written resignation to the Board.  Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make such resignation effective.

Section 6.5     Meetings.

(a)     *Regular Meetings.* Pursuant to a resolution or written consent, the Board may specify the time and place, which may be at the offices of the Company or such other place (either within or outside the State of Texas) as may be determined from time to time by the Board for holding regular meetings thereof without other notice than such resolution; *provided*, that the Board shall hold a meeting at least once every calendar year.

(b)     *Special Meetings.* Special meetings of the Board may be called by or at the request of the Chair of the Board, if any, the Chief Executive Officer, the Investor Director, the Independent Director or any two (2) Management Directors.  The Person(s) authorized to call special meetings of the Board may fix any place either within or outside of the State of Texas as the place for holding any such special meeting called thereby.

(c)     *Notice of Special Meetings.*  Notice of a special meeting of the Board stating the date, time and place of the meeting shall be delivered in writing to each Director at his or her address filed in the records of the Company at least three (3) Business Days before the meeting and in accordance with Section 15.4; *provided*, that, in case of emergency or the approval of any material transaction, shorter notice may be given.  Neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice of such meeting and the Board shall meet at the time set forth in such notice.

(d)     *Attendance and Waiver of Notice*. Whenever any notice is required to be given to any Director under this Agreement or pursuant to the TBOC, a waiver thereof in writing, executed at any time, specifying the meeting for which notice is waived, signed by the Director entitled to such notice, and filed with the minutes of the Company, shall be deemed equivalent to the giving of such notice. The attendance of a Director at any meeting of the Board shall constitute a waiver of notice of such meeting, unless such Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to holding the meeting or transacting any business at the meeting on the grounds that the meeting is not lawfully called or convened and does not thereafter vote for or assent to action taken at the meeting.

Section 6.6     Quorum; Manner of Acting.

(a)     *Quorum*. The presence of Directors holding at least seven (7) votes eligible to be cast at a meeting of the Board shall constitute a quorum for the transaction of business of the Board; *provided*, that from and after the date on which AV ceases to serve as the Independent Director for any reason, the presence of Directors holding at least six (6) votes eligible to be cast at a meeting of the Board shall constitute a quorum for the transaction of business of the Board.  At all times when the Board is conducting business at any meeting of the Board, a quorum of the Board must be present at such meeting.  If a quorum shall not be present at any meeting of the Board, then the Directors present at such meeting, though less than a quorum, may adjourn the meeting from time to time by providing notice of the postponed meeting to the other Directors in the manner set forth in Section 6.5(c).

(b)     *Participation*. Directors may participate in any meeting of the Board by use of any means of telephonic, video or other communication by which all Persons participating may simultaneously hear each other during the meeting.  Participation by such means shall be deemed presence in person at such meeting, unless such Director attends such meeting for the express purpose of objecting, at the beginning of such meeting, to holding such meeting or transacting any business at such meeting on the grounds that such meeting is not lawfully called or convened and does not thereafter vote for or assent to action taken at such meeting.

(c)     *Binding Act*.  A valid act of the Board shall require the affirmative vote of at least a majority of the votes eligible to be cast at a meeting of the Board at which a quorum has been met ("Board Approval").

Section 6.7     Action By Written Consent. Notwithstanding anything herein to the contrary, any action which could be taken at a meeting of the Board may be taken without a meeting, without prior notice and without a vote, if a written consent setting forth a resolution of the Board approving such action is executed by the number of Directors sufficient to meet the quorum requirements set forth in Section 6.6.  Such written consent, which shall have the same effect as a vote of the Directors, shall be inserted in the minute book as if it were the minutes of a Board meeting and delivered to each Director that did not execute such written consent (if any), as promptly as practicable after the execution of such written consent by the other Directors.

Section 6.8     No Employment.  This Agreement does not, and is not intended to, confer upon any Director any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any

Director or preclude any Director from serving the Company in any other capacity and receiving reasonable compensation for such services.

Section 6.9    <u>No Personal Liability</u>**.** Except as otherwise provided by Applicable Law (including the TBOC) or as expressly provided in this Agreement, no Director shall be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries, whether arising in contract, tort or otherwise, solely by reason of being a manager.

Section 6.10    <u>Board Reserved Matters</u>.

(a)    Without Board Approval, the Company shall not, and shall not enter into any commitment to:

(i)    make any determination of Available Cash;

(ii)    declare or make any Distributions;

(iii)    (i) adopt any Proposed Budget, (ii) modify any Approved Budget or (iii) approve expenditures that, individually or in the aggregate, exceed 10% of any Approved Budget or any line item of such Approved Budget;

(iv)    incur any obligations with respect to the payment of any capacity reservation fee, construction fee or other prepayment fees in excess of any Approved Budget or any line item of any Budget;

(v)    incur any indebtedness, pledge or grant liens on any assets or guarantee, assume, endorse or otherwise become responsible for the obligations of any other Person, except to the extent approved or authorized in the Approved Budget or in connection with the Project Financing;

(vi)    make any loan, advance or capital contribution in any Person, except to the extent approved or authorized in the Approved Budget;

(vii)    enter into or amend any agreement involving consideration or amounts received or receivable, or paid or payable in excess of $100,000, other than as provided for in any Approved Budget;

(viii)    enter into or amend any offtake agreement;

(ix)    enter into or amend any agreement which involves real estate, other than as provided for in any Approved Budget;

(x)    (i) commence, waive or settle any lawsuit, action, dispute or other proceeding, (ii) assume any liability except as authorized in an Approved Budget or (iii) agree to the provision of any equitable relief by the Company;

(xi)    appoint or remove any Officers, subject to the rights of the Investor Member pursuant to <u>Section 6.14</u>;

(xii)    enter into, amend, waive or terminate any Affiliate Agreement, subject to Section 6.10(b);

(xiii)    appoint or remove an independent public account or auditor;

(xiv)    adopt or modify any material tax election, or adopt or modify any material tax policies or accounting methods or policies (other than as required by GAAP);

(xv)    cause or permit any Company Subsidiary to take, or to enter into any commitment to take, any of the actions set forth in Section 6.10(a) or Section 7.9(a) as it relates to any Company Subsidiary.

(b)    Any entry into or amendment, waiver or termination of any Affiliate Agreement shall be (i) on terms no less favorable to the Company than those that would have been obtainable in a comparable transaction with an unaffiliated third party on an arm's length basis at the time it is authorized, approved or ratified by the Board and at the time it is entered into, or (ii) approved by a majority of votes held by disinterested Directors, even though the disinterested Directors may hold less than a majority of the votes held by all Directors (and, for the avoidance of doubt, if an Affiliate of the Company having a financial interest in the transaction has appointed a Director, that Director shall be deemed to be an interested Director).

(c)    The Board may, pursuant to a resolution or written consent, amend this Agreement or the Certificate of Formation, in each case, to the extent, and only to the extent, expressly permitted under Section 15.10.

Section 6.11    Budget.

(a)    The Stage 1 Budget in effect as of the date hereof has been approved by the Board prior to the date hereof in accordance with the terms of the Initial LLC Agreement. At least ninety (90) days prior to the completion or expiration of Stage 1 (or the applicable period covered by the previous Approved Budget), the Management Team shall prepare and submit to the Board for its approval in accordance with Section 6.10(a)(iii) a proposed budget (or proposed revisions to or extensions of the previously Approved Budget) for the Company through the subsequent twelve (12)-month period (each a "Proposed Budget" and, as approved by the Board in accordance with Section 6.10(a)(iii) and including, for the avoidance of doubt, the Stage 1 Budget, an "Approved Budget"). The Proposed Budget shall be consistent with the Development Plan, and shall include anticipated project milestones (as applicable), deliverables and work-streams and detailed capital and operating expense budgets, cash flow projections (which shall include amounts and due dates of all projected requests for Additional Capital Contributions, if any, to be approved by the Members in accordance with Section 7.9(a)(iv)) and profit and loss projections.

(b)    Not later than thirty (30) days following its receipt of any Proposed Budget submitted for approval pursuant to Section 6.11(a), the Board must either (i) propose revisions to the Proposed Budget by delivering written notice thereof to the President and Chief Executive Officer specifying any rejected items and proposed revisions to such items or (ii) approve the Proposed Budget pursuant to a resolution or written consent. If the Board shall not have approved to the Proposed Budget prior to the end of such (thirty (30)-day period, then the

23

Management Team shall resubmit a revised Proposed Budget to the Board for its approval not later than fifteen (15) days following its receipt of notice from the Board pursuant to clause (i). If the Board does not approve the revised Proposed Budget on or prior to the date that this fifteen (15) following resubmission by the Management Team of the revised Proposed Budget to the Board, then (A) the Board, pursuant to a resolution or written consent, shall approve the Proposed Budget with respect all items not rejected by the Board pursuant to this Section 6.11(b), and (B) to the extent that any remaining rejected items were provided for in the previous Approved Budget, such rejected items (other than any items for capital expenditures) shall be deemed approved in an amount equal to eighty percent (80%) of the previously approved amount (and all items approved or deemed approved in clauses (A) and (B), together shall constitute the "Approved Budget" for purposes of the period covered by the Proposed Budget to which they relate) and (C) to the extent that any remaining rejected items were not provided for in the previous Approved Budget, such items shall not be deemed approved unless and until the Approved Budget is modified in accordance with Section 6.10(a)(iii).

(c)     The Company shall provide to the Members, at least forty-five (45) day prior to the beginning of each twelve (12)-month period to be covered thereby, a copy of the Approved Budget for such period.

Section 6.12   Deadlock.

(a)     Either Amshale or the Investor Member shall be entitled to exercise the buy-sell rights set forth in this Section 6.12 by delivering a Buy-Sell Offer Notice (as defined herein) upon the occurrence of any of the following events (each, a "Deadlock"):

(i)     at any time, the Members holding at least 90% of the Units held by all Member are unable to agree on a proposal to issue a call for any Additional Capital Contributions pursuant to Section 7.9(a)(iv) and such disagreement continues for thirty (30) days despite good faith efforts by the Members to reach an agreement; or

(ii)     from and after the date on which AV ceases to serve as the Independent Director for any reason, the Board is unable to agree on a proposal to take any of the actions specified in Section 6.10(a) (other than clauses (vii), (xii) and (xiii) with respect to the Company or any Company Subsidiary), whether due to the absence of a quorum at a meeting of the Board postponed in accordance with Section 6.6(a) or for any other reason, and such disagreement continues for two (2) consecutive meetings despite good faith efforts by the Board to reach an agreement.

(b)     If Amshale or the Investor Member wishes to exercise the buy-sell right provided in this Section 6.12, such Member (the "Initiating Member") shall deliver to the other Member (the "Responding Member") written notice (the "Buy-Sell Offer Notice") of such election, which notice shall include (i) a description of the circumstances that triggered the buy-sell right, and (ii) the purchase price (which shall be payable exclusively in cash (unless otherwise agreed)) at which the Initiating Member shall (A) purchase all of the Units owned by the Responding Member (the "Buy-Out Price") or (B) sell all of its Units to the Responding Member (the "Sell-Out Price"), with any difference between the Buy-Out Price and the Sell-Out Price based solely on each Member's Percentage Interest in the Company, without regard to any

market discount or premium from differences in such proportionate interests. Such Buy-Sell Offer Notice shall be delivered, in the case of Section 6.12(a)(i), within thirty (30) days after the expiration of the thirty (30)-day period described therein and, in the case of Section 6.12(a)(ii), no sooner than fifteen (15) days and no later than forty-five (45) days after the date of the second (2nd) meeting of the Board described therein.

(c)     Within thirty (30) days after the Buy-Sell Offer Notice is received (the "Buy-Sell Election Date"), the Responding Member shall deliver to the Initiating Member a written notice (the "Response Notice") stating whether it elects to (i) sell all of its Units to the Initiating Member for the Buy-Out Price or (ii) buy all of the Units owned by the Initiating Member for the Sell-Out Price. The failure of the Responding Member to deliver the Response Notice by the Buy-Sell Election Date shall be deemed to be an election to sell all of its Units to the Initiating Member at the Buy-Out Price.

(d)     The closing of any purchase and sale of Units pursuant to this Section 6.12 shall take place ninety (90) days after the Response Notice is delivered or deemed to have been delivered or some other date mutually agreed upon by the parties. The Buy-Out Price or the Sell-Out Price, as the case may be (the "Buy-Sell Purchase Price"), shall be paid at closing by wire transfer of immediately available funds to an account designated in writing by the selling Member. At the closing, the selling Member shall deliver to the purchasing Member good and marketable title to its Units, free and clear of all liens and encumbrances (other than those arising hereunder and those attributable to the actions of the purchasers thereof). Each Member agrees to cooperate and take all actions and execute all documents reasonably necessary or appropriate to reflect the purchase of the selling Member's Units by the purchasing Member.

(e)     If the purchasing Member defaults in any of its material closing obligations, then the selling Member shall have the option to purchase the purchasing Member's entire Percentage Interest at a price that is equal to fifty percent (50%) of the Buy-Sell Purchase Price.

Section 6.13     Other Activities; Business Opportunities.

(a)     Except as expressly permitted by and in accordance with Section 6.13(b), for a period commencing on the Effective Date and ending on the date of the third (3rd) anniversary of the completion of Stage 1, none of the Members, the members of Amshale or any of their respective Affiliates shall acquire a controlling interest in any entity domiciled in the United States that is or proposes to be engaged in the ethane processing and sale business in the United States.

(b)     In the event that any of Amshale, AV, the members of Amshale or any of their respective Affiliates consider participation in any other project with similar parameters (location, capacity, and technology) as the Facility and with the framework of the Project (the "Second Project"), then such Person (the "Initiating Party") shall promptly provide to the Company a written notice disclosing in reasonable detail such Second Project. The Board shall determine, in its sole discretion, whether the Company shall exclusively participate in such Second Project. If the Board does not approve such exclusive participation, then the Initiating Party may participate in such Second Project without participation by the Company; if, and only if, that the Company shall have the right to receive (i) a 7.5% ownership interest in the Second

25

Project at no cost (if written notice of such Second Project is received by the Project Company on or prior to September 11, 2014, or (ii) a 15% ownership interest in the Second Project at no cost (if written notice of such Second Project is received by the Company after the completion of Stage 1).

  (c) The parties thereto shall cooperate to structure the transactions contemplated by the Second Project in a tax efficient manner.

  (d) The parties hereto expressly acknowledge and agree that, except as expressly provided in Section 6.13(a) and Section 6.13(b), (i) each Member and its Affiliates are permitted to have, and may presently or in the future have, investments or business relationships, ventures, agreements or arrangements with entities engaged in the business of the Company other than through the Company and the Company Subsidiaries (an "Other Business"); (ii) each Member and its Affiliates have or may develop a strategic relationship with businesses that are or may be competitive with the Company and the Company Subsidiaries; (iii) no Member or any of its Affiliates will be prohibited by virtue of the such Member's investment in the Company from pursuing and engaging in any such activities; (iv) no Member or any of its Affiliates will be obligated to inform the Company or any other Member of any such opportunity, relationship or investment (a "Company Opportunity") or to present such Company Opportunity to the Company, and the Company hereby renounces any interest in a Company Opportunity and any expectancy that a Company Opportunity will be offered to it; (v) nothing contained herein shall limit, prohibit or restrict any Board designee of any Member from serving on the board of directors or other governing body or committee of any Other Business; and (vi) Members will not acquire, be provided with an option or opportunity to acquire, or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of other Member or its Affiliates.   Subject to Section 6.13(a) and Section 6.13(b), (A) any Member or any of its Affiliates may engage in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the business of the Company (B) none of the Members nor any of their Affiliates shall be obligated to account to the Company or to the other Member for any profits or income earned or derived from other such activities or businesses, (C) none of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Member of any business opportunity of any type or description, and (D) the parties hereto expressly authorize and consent to the involvement of the Members and/or their respective Affiliates in any Other Business; *provided*, that any transactions between the Company and/or the Company Subsidiaries and any Other Business shall be on terms no less favorable to the Company and/or the Company Subsidiaries than would be obtained in a comparable arm's-length transaction with an unaffiliated third party, and the parties hereto expressly waive, to the fullest extent permitted by Applicable Law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed to the Company or any Member or to assert that such involvement constitutes a conflict of interest by such Persons with respect to the Company or any Member.

  Section 6.14 Officers; Management Team.

  (a) In connection with the formation of the Company, the Investor Member has appointed and delegated power and authority to officers of the Company ("Officers," with all of

the Officers serving as officers of the Company at any given time, together, the "Management Team") to act on behalf of the Company on such terms and conditions as the Investor Member has determined by written consent.  As of the date hereof, the Officers of the Company, and their respective titles, are set forth on Schedule II.

(b)      The President and Chief Executive Officer shall have the authority to take any and all actions necessary and appropriate to carry out the operations of the Company in a manner consistent with the purpose and nature of the Company's business and in accordance with the Approved Budget and to execute, deliver and perform any document on behalf of the Company in connection therewith, subject to approval of the Board or the Members, as applicable, with respect to actions expressly requiring approval of, or decisions or determinations expressly required or permitted to be made by, the Board or the Members, as applicable, pursuant to this Agreement.

(c)      The Board may from time to time and in accordance with Section 6.10(a)(xi), appoint one or more Officers, including, without limitation, a President and Chief Executive Officer, Chief Financial Officer, Secretary and/or Treasurer, to act on behalf of the Company on such terms and conditions as the Board may determine (or modify, expand, restrict or eliminate any power and authority delegated to any Officer previously appointed by the Investor Member or by the Board); *provided*, that, upon written request of the Investor Member, the Board shall appoint up to two (2) representatives designated by the Investor Member to the Management Team on a full-time basis (the "Investor Representatives"), which Investor Representatives shall be deemed Officers of the Company for all purposes hereunder.

(d)      Each such Officer shall have such title and authority and perform such duties and powers as are customarily incident to his or her office (or as the Board may otherwise designate), shall conduct the business of the Company in the ordinary course and in accordance with the Approved Budget, and shall serve as an Officer until his or her resignation, removal, Disability, or death, or until his or her successor shall have been duly elected and qualified.

(e)      Without limiting the foregoing, and without limiting any of the duties or obligations of the Management Team set forth in Article III and Section 6.11, the Management Team shall keep the Board and the Members reasonably informed on a timely basis of any material fact, information, litigation, employee relations or other matter that could reasonably be expected to have a material impact on the operations or financial position of the Company or the Project, including, but not limited to, any modification of any loan or other financing to the Company, any delays in the Project schedule, any expenditures materially deviating from the Approved Budget and any other event or circumstance that has or could reasonably have a material adverse effect on the Approved Budget or the Project.  The Management Team shall provide all material information relating to the Company or the management or operation of the Company or the development of the Project as the Board or any Member may reasonable request from time to time.

(f)      Any Officer (other than any Investor Representative) may be removed as such, either with or without cause, by the Board, subject to the terms of its respective employment agreement (if any).  Any Investor Representative may only be removed from the Management Team with the prior written consent, or at the written request of, the Investor Member.  Any

vacancy occurring in any office of the Company may be filled by the Board; *provided*, that, upon the written request of the Investor Member, the Board shall fill any vacancy occurring in any office held by any Investor Representative with a representatives designated the Investor Member.

## ARTICLE VII
## MEMBERS

Section 7.1    Admission of New Members.

(a)    New Members may be admitted from time to time (i) in connection with the issuance of Units by the Company, subject to Section 7.9(a)(iv), Section 9.1(a) and Section 10.1, and (ii) in connection with a Transfer of Units, subject to Section 4.4 and Article IX, and, in the case of each of clauses (i) and (ii), *provided*, that such Person shall have executed and delivered an agreement to be bound by this Agreement in the substantially the form of the Joinder Agreement and delivered to all Members a true and complete copy of the instrument(s) pursuant to which it is acquiring Units in connection with the issuance or Transfer of Units, if available.  Such Person shall be admitted as a Member effective upon the satisfaction or waiver in writing by all Members of the requirements of this Section 7.1(a).

(b)    The Board shall cause the register of the Company and Member Schedule to be updated from time to time upon the issuance or Transfer of any Units to any new or existing Member in accordance with this Agreement and as otherwise necessary to accurately reflect the information required to be included therein.  Any amendment or revision to Member Schedule made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Unless otherwise specified herein, any reference to Member Schedule in this Agreement shall be deemed to be a reference to Member Schedule as amended and in effect from time to time.

Section 7.2    Representations and Warranties of Members.

(a)    By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 7.1(a), represents and warrants to the Company and acknowledges that:

(i)    The Member is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of formation, and is duly qualified, authorized or licensed and is in good standing, or the local equivalent, in each jurisdiction in which it does business. The Subscriber has full legal capacity, power, and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by the Member and is the legal, valid and binding obligation of the Member, enforceable in accordance with its terms (except as enforceability may be limited by principles of public policy, applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights and remedies generally or general principles of equity (regardless of whether considered and applied in a proceeding at law or in equity)).

28

(ii)    No legal action, suit, arbitration or other legal, administrative or other governmental investigation, inquiry or proceeding (whether federal, state, local or foreign) is pending or, to Member's knowledge, threatened, against Member that, if adversely determined, is reasonably likely to impair or otherwise affect the Member's ability to perform its obligations under this Agreement or is reasonably likely to have a material adverse effect on the Member's financial condition.

(iii)    The Member has been advised the Company Units have not been registered under the Securities Act or any state securities laws, are issued in reliance upon federal and state exemptions for transactions not involving a Public Offering and, therefore, the cannot be transferred, sold, assigned, pledged, hypothecated, or otherwise disposed of unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Member is aware that the Company is not under any obligation to effect any such registration with respect to the Company Units (except solely to the extent, if any, provided in this Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time) or to file for or comply with any exemption from registration or assist the Member in obtaining any exemption therefrom.

(iv)    The Member is acquiring the Company Units for its own account and not with a view to, or for resale in connection with, the distribution thereof in violation of the Securities Act, and does not have a current plan or intention to dispose of its Company Units.

(v)    The Member has such knowledge and experience in financial and business matters that the Member is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time.

(vi)    The Member is an accredited investor within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units.

(vii)    If the Member is an entity formed for the purpose of acquiring the Company Units, the Member also hereby makes the representations and warranties contained herein with respect to and on behalf of all of the beneficial owners of such entity and acknowledges that each such beneficial owner may be required to make such representations and warranties individually.

(viii)    The Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company for such purpose.

29

(ix)    The Member has had the opportunity to consult its own independent legal, tax, accounting and other advisors with respect to the Member's rights and obligations under this Agreement and the tax and other economic consequences to itself of the acquisition, receipt, ownership or disposition of the Company Units, including the tax consequences under federal, state, local, and other income tax laws of the United States or any other country and the possible effects of changes in such tax laws. The Member is not relying on the Company, its unitholders, members, managers or any affiliate of any of the foregoing or any of their respective officers, employees, agents, representatives, partners (whether limited or general) or advisors with respect to the legal, tax, economic and related considerations of an investment in the Company Units.

(x)    The Member understands and agrees that the investment in the Company involves a substantial degree of risk, including the possible loss of all or part of the value of such Company Units, and that no guarantees have been made or can be made with respect to the future value of the Company Units or the future profitability or success of the Company or any of its subsidiaries. The Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(xi)    Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Member is subject or any provision of the Member's organizational documents, or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Member is a party or by which it is bound or to which any of its assets is subject.

(xii)    The Member acknowledges that the Company seeks to comply with all applicable anti-money laundering laws and regulations. The Member does not know or have any reason to suspect that: (A) any part of the funds used by the Member to acquire its Company Units or to satisfy its commitment herein has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal, state or non-United States laws and regulations, including anti-money laundering laws and regulations; (B) the proceeds from the Member's investment in the Company will be used to finance any illegal activities; and (C) any commitment, contribution or payment to the Company by  Member shall cause the Company or any of its affiliates to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Member does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury and, to the knowledge of the Member, based on application of anti-money laundering policies and procedures applicable to the Member and its affiliates, no person having a direct or indirect beneficial interest in the Member's investment in the Company appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets

Control of the United States Department of the Treasury (it being acknowledged that, for purposes of this sentence, only shareholders having a 50% or greater economic interest in the Member shall be deemed to have a beneficial interest in the Member's investment in the Company).  The Member agrees to provide, except to the extent prohibited by law, such additional information and representations promptly as the Company may request to ensure compliance with all applicable anti-money laundering laws and regulations.

(xiii)   The information that the Member has provided in this Agreement and, to its knowledge, in any U.S. Internal Revenue Service or other tax form delivered to the Company is true, accurate and complete and may be relied upon by the Company for any purpose, including the establishment of subscriber-related facts underlying claims of exemption from the registration provisions of federal and state securities laws. The Member acknowledges that the Company is relying on such information in connection with (a) the Member being admitted as a member of the Company, (b) not registering the offer and sale of the Company Units under the Securities Act or any state securities laws, (c) not registering the Company under the Investment Company Act and (d) the management of the Company's business. If at any time during the term of the Member's membership in the Company any of the representations, warranties and covenants contained in this Agreement shall cease to be true, the Member will promptly notify the Company in writing.

(b)      None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in the Unit Purchase Agreement.

Section 7.3      Authority; No Personal Liability.

(a)      No Member, in its capacity as a Member, shall participate in the control or management of the business and affairs of the Company or have the power to act for or on behalf of, or to bind, the Company, other than (i) with respect to the designation, removal and replacement of Directors pursuant to Article VI, (ii) pursuant to Section 7.9 and (iii) as otherwise expressly provided for herein.

(b)      Except as otherwise provided by Applicable Law or as expressly provided herein, no Member shall be personally obligated for any debt, obligation or liability of the Company or of any Company Subsidiaries or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 7.4      No Withdrawal.  A Member shall not cease to be a Member as a result of the Bankruptcy of such Member.  So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 7.5      Voting.  Except as otherwise provided by this Agreement (including Section 15.10) or as otherwise required by Applicable Law, each Member shall be entitled to one

(1) vote per Unit on all matters upon which the Members have the right to vote under this Agreement.

Section 7.6    Meetings.

(a)    *Member Meetings*. Meetings of the Members may be called by (i) the Board or (ii) by a Member or group of Members holding more than ten percent (10)% of the Units held by all Members.

(b)    *Notice*. Written notice stating the place, date and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered to each Member in writing or by Electronic Transmission at the address set forth in the Member Schedule in accordance with Section 15.4 not fewer than fifteen (15) days and not more than forty-five (45) days before the date of the meeting to each Member, by or at the direction of the Board or the Member(s) calling the meeting, as the case may be. The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include any business to be conducted by the Members.  The Members may hold meetings at the Company's principal office or at such other place as the Board or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)    *Attendance Waiver*. Whenever any notice is required to be given to any Member under this Agreement or pursuant to the TBOC, a waiver thereof in writing, executed at any time, specifying the meeting for which notice is waived, signed by the Member entitled to such notice, and filed with the minutes of the Company, shall be deemed equivalent to the giving of such notice. The attendance of a Member at any meeting of the Members shall constitute a waiver of notice of such meeting, unless such Member attends a meeting for the express purpose of objecting, at the beginning of the meeting, to holding the meeting or transacting any business at the meeting on the grounds that the meeting is not lawfully called or convened and does not thereafter vote for or assent to action taken at the meeting..

Section 7.7    Quorum; Manner of Acting.

(a)    *Quorum*. The presence of the Members holding at least 90% of the Units held by all Members shall constitutes a quorum at any meeting of the Members. Subject to Section 7.8, no action at any meeting may be taken by the Members unless a quorum is present. If a quorum shall not be present at any meeting of the Board, then the Members present at such meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b)    *Participation*. Members may participate in any meeting of the Members by use of any means of telephonic, video or other communication by which all Persons participating may simultaneously hear each other during the meeting.  Participation by such means shall be deemed presence in person at such meeting, unless a Member attends such meeting for the express purpose of objecting, at the beginning of such meeting, to holding such meeting or transacting any business at such meeting on the grounds that such meeting is not lawfully called or convened and does not thereafter vote for or assent to action taken at such meeting.

(c)     *Binding Act.*  A valid act of the Members shall require the affirmative vote of Members holding at least 90% of the Units held by all Members ("Member Approval").

(d)     *Vote by Proxy.* On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law; *provided*, that such proxy shall specify how the proxy holder must vote and shall not provide for any discretion to be exercised by such proxy holder in connection with the matters to be voted upon by such proxy holder. Every proxy shall be revocable in the discretion of the Member executing it unless otherwise expressly provided in such proxy; *provided*, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

Section 7.8     Action by Written Consent. Any matter that is to be voted on, consented to or approved by Members may be taken without a meeting, without prior notice and without a vote if a written consent setting forth a resolution of the Members approving such action is executed by Members holding at least 90% of the Units held by all Members. Such written consent, which shall have the same effect as a vote of the Members, shall be inserted in the minute book as if it were the minutes of a Member meeting and delivered to each Member that did not execute such written consent (if any), as promptly as practicable after the execution of such written consent by the other Members.

Section 7.9     Member Reserved Matters.

(a)     Without Member Approval, the Company shall not, and shall not enter into any commitment to:

(i)     dissolve or wind up the Company, revoke any decision to wind up the Company, cancel an event requiring wind-up of the Company, or reinstate the Company after its termination;

(ii)     file a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of the debts of the Company under Title 11 of the United States Code or any other federal or state insolvency law, or file an answer consenting to or acquiescing in any such petition;

(iii)     change the nature of the business or purpose of the Company, enter into any new line of business or take any action that would make it impossible to carry on the ordinary business of the Company;

(iv)     admit any Person as Member (except as otherwise expressly permitted pursuant to Section 9.2), issue a call for any Additional Capital Contributions, issue or sell any Units or modify the rights or obligations inherent to the Units, including the creation of a new class of Units having rights superior to the Units of any Member;

(v)     sell all or substantially all of the assets of the Company or merge, consolidate or enter into any other business combination, interest exchange, conversion, refinancing or recapitalization;

(vi)     initiate or consummate an initial Public Offering or make a Public Offering and sale of the Units or any other securities;

(vii)    form any Subsidiary or enter into any partnership or joint venture or make any investments in any other Person;

(viii)   permit any pledge or voluntary encumbrance of a Member's Units as security for any financing transaction (other than as required in connection with (i) the Eucla Pledge Agreement or (ii) the Project Financing);

(ix)     make a determination of Fair Market Value;

(x)      adopt or modify any Development Plan;

(xi)     sell, or make a determination regarding the use of, the Surplus Land; or

(xii)    select a Liquidator, subject to and in accordance with Section 14.3(a).

(b)     The Members may amend this Agreement or the Certificate of Formation, in each case, to the extent, and only to the extent, expressly permitted under Section 15.10.

Section 7.10    No Interest in Company Property.   No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.   Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

ARTICLE VIII
DISTRIBUTIONS

Section 8.1    General.

(a)     Distributions of 100% of Available Cash shall be made to the Members when and in such amounts as determined by the Board in accordance with Section 6.10(a)(ii). Distributions determined to be made by the Board pursuant to this Section 8.1(a) shall be paid to the Members *pro rata* in accordance with their respective Percentage Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate the TBOC or other Applicable Law.

Section 8.2    Tax Withholding.

(a)     The Company is hereby authorized at all times to make payments with respect to each Member in amounts required to discharge any obligation of the Company (as determined based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority with respect to any payment to such Member and to withhold the same from payments to such Member. Any funds withheld from a payment

34

by reason of this <u>Section 8.2(a)</u> shall nonetheless be deemed paid to the Member in question for all purposes under this Agreement to the extent that the Company complies with Applicable Law with respect to the withholding (including any Applicable Law for depositing the tax withheld with a taxing authority).

(b)     *Overwithholding.* Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any payment to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate taxing authority.

(c)     *Cooperation.* The Company and each Member shall reasonably cooperate (i) to establish a reduction in, or exemption from, any applicable withholding tax to which such Member is entitled with respect to any payments from the Company (including the provision of reasonable and timely notice of any applicable withholding tax and the provision of an executed IRS Form W-9 or W-8) and (ii) to obtain any refund to the extent there has been any overwithholding on any payments to such Member.

Section 8.3     <u>Distributions in Kind</u>.

(a)     The Board is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided*, that the Board shall ensure that the Company has sufficient assets to meet its tax liabilities resulting from such Distributions. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to <u>Section 8.1</u>.

(b)     Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that the Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

ARTICLE IX
TRANSFER

Section 9.1     <u>Restrictions on Transfer</u>.

(a)     No Member may Transfer any Units during the Lock-Up Period, except as permitted pursuant to <u>Section 9.2</u>, in accordance with the procedures set forth in <u>Section 9.5</u>, or in connection with the consummation of a Qualified Public Offering.

(b)     Following the Lock-Up Period, no Member (or any Permitted Transferee of such Member) shall Transfer any Units except as permitted pursuant to <u>Section 9.2</u> or in accordance with the procedures set forth in <u>Section 9.3</u> and <u>Section 9.4</u>, as applicable.

(c)     Notwithstanding any other provision of this Agreement (including <u>Section 9.2</u>), each Member agrees that, prior to the consummation of a Qualified Public Offering, it will not Transfer all or any portion of its Units in the Company, and the Company agrees that it shall not issue any Units:

(i)     except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)     if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the TBOC; or

(iii)     if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended.

(d)     Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded in the Company's register and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units for all purposes of this Agreement.

(e)     For the avoidance of doubt, any Transfer of any Units permitted by this Agreement shall be deemed a sale, transfer, assignment or other disposal of such Units in their entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment or other disposal of any less than all of the rights and benefits described in the definition of the term "Units" with respect to such Units, unless otherwise expressly agreed to by the parties to such Transfer; *provided*, that the rights of the Members to designate, remove and replace Directors pursuant to <u>Article VI</u> shall not be transferable by the Members except (i) in a Transfer of all, but not less than all, of such Member's Units or (ii) in a Permitted Transfer by the Investor Member pursuant to <u>Section 9.2(b)</u>.

(f)     No Transfer of Units to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with <u>Section 7.1(a)</u> hereof.

Section 9.2     <u>Permitted Transfers</u>.  The provisions of <u>Section 9.1(a)</u>, <u>Section 9.1(b)</u>, <u>Section 9.3</u>, <u>Section 9.4</u> and <u>Section 9.5</u> shall not apply to any Transfer (each of the following, a "<u>Permitted Transfer</u>") (a) by any Member of any or all of its Units pursuant to a Public Offering, (b) in connection with the pledge of Units under the Eucla Pledge Agreement or any foreclosure upon pledged or encumbered Units pursuant to the Eucla Pledge Agreement or (c) by the Investor Member of any or all of its Units to (i) any of its Affiliates or (ii) Eucla or Datani or any of their respective Affiliates.

Section 9.3     <u>Right of First Refusal</u>.

(a)     <u>Application; Exceptions</u>.

(i)     Subject to <u>Section 9.1</u>, <u>Section 9.2</u> and this <u>Section 9.3</u>, if, at any time from and after the expiration of the Lock-Up Period and prior to the consummation of a Qualified Public Offering,, any Member (a "<u>Selling Member</u>") receives an offer for the purchase of all or any portion of its Units ("<u>Sale Units</u>") from a Third Party Purchaser (other than Transfers that (A) are permitted by <u>Section 9.2</u>, or (B) are made by a Tag-Along Member upon the exercise of its tag-along right pursuant to <u>Section 9.4</u> after the ROFR Rightholders have declined to exercise their rights in full under this <u>Section 9.3</u>), then, prior to Transferring such Sale Units to the Third Party Purchaser, each ROFR Rightholder shall have a right of first refusal with respect to such Transfer on the terms and subject to the conditions set forth in this <u>Section 9.3</u>.

(ii)    As used herein, the term "<u>ROFR Rightholder</u>" means any Member other than the Selling Member.

(b)     <u>Offer Notice</u>.

(i)     The Selling Member shall, within fifteen (15) days after receipt of the offer from Third Party Purchaser, deliver a written notice (the "<u>Selling Member Notice</u>") to the ROFR Rightholders indicating that it has received an offer for the purchase of Sale Units from a Third Party Purchaser.  Such Selling Member Notice shall specify: (A) the number of Sale Units to be Transferred by the Selling Member; (B) the purchase price per Sale Unit (which shall be payable solely in cash) and the other material terms and conditions of the Transfer; and the name of the Third Party Purchaser.

(ii)    The Selling Member Notice shall constitute the Selling Member's offer of the Sale Units to the ROFR Rightholders, which offer shall be irrevocable until the end of the Option Period described in <u>Section 9.3(c)(ii)</u>.

(iii)   By delivering the Selling Member Notice, the Selling Member represents and warrants to each ROFR Rightholder that: (A) the Selling Member has full right, title and interest in and to the Sale Units; (B) the Selling Member has all the necessary power and authority and has taken all necessary action to Transfer such Sale Units as contemplated by this <u>Section 9.3</u>; and (C) the Sale Units are free and clear of all liens other than those arising as a result of or under the terms of this Agreement.

(c)     <u>Exercise of Right of First Refusal.</u>

(i)     Upon receipt of the Selling Member Notice, the ROFR Rightholders shall have the right to purchase the Sale Units in accordance with the procedures set forth in <u>Section 9.3(c)(ii)</u>; <u>provided</u>, that the ROFR Rightholders may only exercise their right to purchase the Sale Units if, after giving effect to all elections made under this <u>Section 9.3(c)</u>, all (but not less than all) of the Sale Units will be purchased by the ROFR Rightholders.

(ii)    Each ROFR Rightholder shall have the right to purchase all or none of its Pro Rata Portion of the Sale Units by delivering a written notice (a "<u>ROFR Exercise Notice</u>") to the Selling Member within fifteen (15) days after receipt of the Selling Member Notice (the "<u>Option Period</u>"). Such ROFR Exercise Notice shall specify (A) that

the ROFR Rightholder desires to purchase its Pro Rata Portion of the Sale Units on the terms and at the purchase price set forth in the Selling Member Notice and (B) the number of remaining Sale Units that it wishes to purchase in the event that any other ROFR Rightholder does not elect to purchase its entire Pro Rata Portion of the Sale Units. Any ROFR Exercise Notice shall be binding upon delivery and irrevocable by the ROFR Rightholder that delivered such notice.

(iii)    The failure of any ROFR Rightholder to deliver a ROFR Exercise Notice by the end of the Option Period shall constitute a waiver of its rights of first refusal under this Section 9.3 with respect to such Sale Units, but shall not affect its rights with respect to any subsequent offers of Sale Units under this Section 9.3.

(d)    Consummation of Sale. In the event that the ROFR Rightholders shall have, in the aggregate, exercised rights to purchase all (but not less than all) of the Sale Units, then the Selling Member shall sell to the ROFR Rightholders, and the ROFR Rightholders shall purchase, such Sale Units, within ninety (90) days after the expiration of the Option Period. Each Member shall take all actions as may be reasonably necessary to consummate the sale contemplated by this Section 9.3(d), including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate. At the closing of any purchase and pursuant to this Section 9.3(d), the Selling Member shall deliver to the participating ROFR Rightholders certificates representing the Sale Units to be sold, free and clear of all liens (other than those arising as a result of or under the terms of this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid and stamps affixed, if necessary, against receipt of the purchase price therefor from the ROFR Rightholders by certified or official bank check or by wire transfer of immediately available funds.

(e)    Sale to Third Party Purchaser. In the event that the ROFR Rightholders shall not have, in the aggregate, exercised rights to purchase all (but not less than all) of the Sale Units, then the Selling Member may sell all of such Sale Units, at a purchase price per Sale Unit no less than the purchase price per Sale Unit specified in the Selling Member Notice and on terms and subject to conditions which are substantially the same in the aggregate as those specified in the Offering Member Notice; *provided*, that the Selling Member has also complied with the provisions of Section 9.4, to the extent applicable; and, *provided*, *further*, that the Transfer of such Sale Units to the Third Party Purchaser occurs within ninety (90) days after expiration of the Option Period. Any Sale Units not Transferred within such ninety (90)-day period shall be subject to the provisions of this Section 9.3 upon subsequent Transfer.

Section 9.4    Tag-Along Rights.

(a)    Application. Subject to Section 9.1, Section 9.2 and this Section 9.4, if, at any time from and after the expiration of the Lock-Up Period and prior to the consummation of a Qualified Public Offering, a Selling Member proposes to sell Sale Units to a Third Party Purchaser in a proposed purchase and sale in which the ROFR Rightholders have not exercised their rights in full under Section 9.3 to purchase all of the Offered Units, then, prior to Transferring such Sale Units to the Third Party Purchaser, each other Member (a "Tag-Along Member") shall have the right to participate in such sale (a "Tag-Along Sale") on the terms and subject to the conditions set forth in this Section 9.4.

(b)     Sale Notice. Prior to the consummation of any purchase and sale of Units qualifying under Section 9.4(a) and after satisfying its obligations pursuant to Section 9.3, the Selling Member shall deliver to each Tag-Along Member (i) a written notice (a "Tag-Along Notice") of the proposed Tag-Along Sale as soon as practicable following the expiration of the Option Period, and in no event later than fifteen (15) days thereafter. Such Tag-Along Notice make reference to the Tag-Along Members' rights hereunder and shall specify: (A) the number of Sale Units that the Third Party Purchaser has offered to Purchase; (B) the purchase price per Sale Unit (which shall be payable solely in cash) and the other material terms and conditions of the Transfer; and the identity of the Third Party Purchaser and (ii) a copy of any form of agreement proposed to be executed in connection therewith.

(c)     Exercise of Tag-Along Right.

(i)     Each Tag-Along Member timely electing to participate in the Tag-Along Sale pursuant to Section 9.4(c)(ii) shall have the right to Transfer in the Tag-Along Sale the number of Units equal to the product obtained by multiplying (x) the number of Units held by the Tag-Along Member by (y) a fraction (A) the numerator of which is equal to the number of Units the Selling Member proposes to sell or transfer to the Third Party Purchaser and (B) denominator of which is equal to the number of Units then owned by such Selling Member (such amount, the "Tag-Along Portion").

(ii)     Each Tag-Along Member shall exercise its right to participate in a Tag-Along Sale by delivering to the Selling Member a written notice (a "Tag-Along Exercise Notice") stating its election to do so and specifying the number of Units (up to its Tag-Along Portion) to be Transferred by it no later than fifteen (15) days after receipt of the Tag-Along Notice (the "Tag-Along Exercise Period").

(iii)     The offer of each Tag-Along Member set forth in a Tag-Along Exercise Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Member shall be bound and obligated to consummate the Transfer on the terms and subject to the conditions set forth in this Section 9.4.

(iv)     The Selling Member shall use its commercially reasonable efforts to include in the proposed sale to the Third Party Purchaser all of the Units that the Tag-Along Members have requested to have included pursuant to the applicable Tag-Along Exercise Notices, it being understood that the Third Party Purchaser shall not be required to purchase Units in excess of the number set forth in the Tag-Along Notice.  In the event the Third Party Purchaser elects to purchase less than all of the Units sought to be sold by the Tag-Along Members, the number of Units to be sold to the Third Party Purchaser by the Selling Member and each Tag-Along Member shall be reduced so that each such Member is entitled to sell its Percentage Interest of the number of Units the Third Party Purchaser elects to purchase (which in no event may be less than the number of Units set forth in the Tag-Along Notice).

(d)     Waiver. Each Tag-Along Member that does not deliver a Tag-Along Exercise Notice in compliance with Section 9.4(c)(ii) shall be deemed to have waived all of such Tag-Along Member's rights to participate in the Tag-Along Sale with respect to the Units owned by

such Tag-Along Member, and the Selling Member shall (subject to the rights of any other participating Tag-Along Member) thereafter be free to sell to the Third Party Purchaser the Units identified in the Tag-Along Notice at a per Unit price that is no greater than the applicable per Unit price set forth in the Tag-Along Notice and on terms and subject to conditions which are substantially the same in the aggregate as those set forth in the Tag-Along Notice, without any further obligation to the non-accepting Tag-Along Members.

(e)     <u>Conditions of Sale</u>.

(i)     Each Member participating in the Tag-Along Sale shall receive the same consideration per Unit after deduction of such Member's proportionate share of the related expenses in accordance with <u>Section 9.4(g)</u> below.

(ii)     Each Tag-Along Member shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Member makes or provides in connection with the Tag-Along Sale; *provided*, that each Tag-Along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Tag-Along Member, and other matters relating to such Tag-Along Member, but not with respect to any of the foregoing with respect to any other Members or their Units; *provided*, *further*, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be *pro rata* based on the consideration received by the Selling Member and each Tag-Along Member, in each case in an amount not to exceed the aggregate proceeds received by the Selling Member and each such Tag-Along Member in connection with the Tag-Along Sale.

(f)     <u>Cooperation</u>. Each Tag-Along Member shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Member, but subject to <u>Section 9.4(e)(ii)</u>.

(g)     <u>Expenses</u>. The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or on behalf of a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the Third Party Purchaser, shall be shared by the Selling Member and all the participating Tag-Along Members on a *pro rata* basis, based on the consideration received by each such Member; *provided*, that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale.

(h)     <u>Consummation of Sale</u>. The Selling Member shall have sixty (60) days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those set forth in the Tag-Along Notice (which such sixty (60)-day period may be extended for a reasonable time not to exceed ninety (90) days

to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority). If at the end of such period the Selling Member has not completed the Tag-Along Sale, the Selling Member may not then effect a Transfer that is subject to this Section 9.4 without again fully complying with the provisions of this Section 9.4.

(i)     Transfers in Violation of the Tag-Along Right.  Any attempted sale or other Transfer by a Selling Member to a Third Party Purchaser any of its Units in breach of this Section 9.4 shall be null and void.

Section 9.5     Transfers During the Lock-Up Period.  If, during the Lock-up Period, any Member receives a binding irrevocable offer from a Third Party Purchaser to acquire all (but not less than all) of such Member's Units, and the Third Party Purchaser also makes a binding irrevocable offer to acquire 100% of the issued and outstanding Units of the Company at the price not less than (a) the sum of all capital contributions made to the Company by the Members prior to the date of such offer (including the Initial Contributions, any Additional Capital Contributions made in accordance with Section 5.2(b)) *plus* (b) a cumulative return on the sum set forth in clause (a) equal to 75% per annum, then upon written notice from such Member to other Members the Lock-up Period shall be deemed to be expired and, subject to the prior application of Section 10.3, such Member shall sell all of its Units to the Third Party Purchaser and each other Member shall be entitled (but shall not be required) to participate in such sale with respect to all (but not less than all) of its Units at the same purchase price per Unit as the purchase price per and on the same terms and subject to the same conditions of sale by such Member.

Section 9.6     Change in Control of a Member.  Any Change of Control of a Member shall require the consent of the other Members.  For purposes of this Section 9.6, "Change of Control" means: (a) the sale of all or substantially all of the consolidated assets of the Member to any Person who, immediately prior to the contemplated transaction, does not directly or indirectly own or have the right to acquire any outstanding equity interests in such Member, (b) a sale resulting in no less than a majority of the outstanding equity interests of a Member being held by any Person who, immediately prior to the contemplated transaction, does not directly or indirectly own or have the right to acquire any outstanding equity interests in such Member; or (c) a merger, consolidation, recapitalization or reorganization of the Member with or into such Person which results in the inability of the controlling equityholder(s) of such Member immediately prior to the contemplated transaction to designate or elect a majority of the managers (or the board of directors (or its equivalent)) of the resulting entity or its parent company, except, in the case of each of clauses (a) through (c), where such Member is the Investor Member and such Person is Eucla, Datani or any of their respective Affiliates.

ARTICLE X
PREEMPTIVE RIGHTS AND REGISTRATION RIGHTS

Section 10.1     Pre-Emptive Rights.

(a)     Issuance of New Units.  The Company hereby grants to each Member the right to purchase, in accordance with the procedures set forth in this Section 10.1, such Member's Percentage Interest of any New Units that the Company may from time to time propose to issue

41

or sell to any party between the date hereof and the consummation of a Qualified Public Offering.

(b)      Definition of New Units.  The term "New Units" shall mean any authorized but unissued Units, other than Units issued or sold by the Company in connection with: (i) any merger, consolidation or other business combination, interest exchange, conversion, refinancing or recapitalization, in each case, in which Units are issued for or in respect of previously outstanding Units; (ii) as consideration to a selling Person in connection with the acquisition of another Person by the Company or any Company Subsidiary; (iii) any Public Offering; or (iv) any transaction in which lenders or other institutional investors (excluding any Member) provide debt financing to the Company or any Company Subsidiary.

(c)      Additional Issuance Notices.  The Company shall give written notice (an "Issuance Notice") of any proposed issuance or sale described in Section 10.1(a) to the Members within ten (10) Business Days following any Member Approval in accordance with Section 7.9(a)(iv).  The Issuance Notice shall, if applicable, be accompanied by a written offer from any prospective purchaser seeking to purchase New Units (a "Prospective Purchaser") and shall set forth the material terms and conditions of the proposed issuance or sale, including;

(i)      the number and description of the New Units proposed to be issued and the percentage of the Company's Units then outstanding (both in the aggregate and with respect to each class or series of Units proposed to be issued) that such issuance would represent;

(ii)      the proposed issuance date, which shall be at least twenty (20) Business Days from the date of the Issuance Notice; and

(iii)      the proposed purchase price per unit of the New Units.

The Issuance Notice shall also be accompanied by a current copy of the Member Schedule indicating the Members' holdings of Units in a manner that enables each Pre-emptive Member to calculate its Percentage Interest.

(d)      Exercise of Pre-Emptive Rights.  Each Member shall for a period of fifteen (15) Business Days following the receipt of an Issuance Notice (the "Exercise Period") have the right to elect irrevocably to purchase all or any portion of its Percentage Interest of any New Units at the respective purchase prices set forth in the Issuance Notice by delivering a written notice to the Company (an "Acceptance Notice") specifying the number of New Units it desires to purchase.  The delivery of an Acceptance Notice by a Member shall be a binding and irrevocable offer by such Member to purchase the New Units described therein. The failure of a Member to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this Section 10.1 with respect to the purchase of such New Units, but shall not affect its rights with respect to any future issuances or sales of New Units.

(e)      Over-Allotment.  No later than ten (10) Business Days following the expiration of the Exercise Period, the Company shall notify each Member in writing of the number of New Units that each Member has agreed to purchase (including, for the avoidance of doubt, where such number is zero) (the "Over-Allotment Notice").  Each Member exercising its rights to

42

purchase its Percentage Interest of the New Units in full (an "Exercising Member") shall have a right of over-allotment such that if any other Member has failed to exercise its right under this Section 10.1 to purchase its full Percentage Interest of the New Units (each, a "Non-Exercising Member"), such Exercising Member may purchase its Percentage Interest of such Non-Exercising Member's allotment by giving written notice to the Company within ten (10) Business Days of receipt of the Over-Allotment Notice (the "Over-Allotment Exercise Period").

(f)     Sales to the Prospective Purchaser. Following the expiration of the Exercise Period and, if applicable, the Over-Allotment Exercise Period, the Company shall be free to complete the proposed issuance or sale of New Units described in the Issuance Notice with respect to which Members declined to exercise the pre-emptive right set forth in this Section 10.1 on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Units to be issued or sold by the Company may be reduced); *provided*, that: (i) such issuance or sale is closed within thirty (30) Business Days after the expiration of the Exercise Period and, if applicable, the Over-Allotment Exercise Period (subject to the extension of such thirty (30) Business Day period for a reasonable time not to exceed forty (40) Business Days to the extent reasonably necessary to obtain any third-party approvals); and (ii) for the avoidance of doubt, the price at which the New Units are sold to the Prospective Purchaser is at least equal to or higher than the purchase price described in the Issuance Notice. In the event the Company has not sold such New Units within such time period, the Company shall not thereafter issue or sell any New Units without first again offering such Units to the Members in accordance with the procedures set forth in this Section 10.1.

(g)     Closing of the Issuance. The closing of any purchase by any Member pursuant to this Section 10.1 shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Units in accordance with this Section 10.1, the Company shall deliver the New Units free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Units shall be, upon issuance thereof to the Exercising Members and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. The Company, in the discretion of the Board pursuant to Section 4.4, may deliver to each Exercising Member certificates evidencing the New Units. Each Exercising Member shall deliver to the Company the purchase price for the New Units purchased by it by certified or bank check or wire transfer of immediately available funds. Each party to the purchase and sale of New Units shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including, without limitation, entering into such additional agreements as may be necessary or appropriate.

Section 10.2     Other Pre-Emptive Rights.  To the extent not covered by Section 10.1, each Member shall have the right to purchase such Member's Pro Rata Portion of any Units or New Interests or other equity interests issued by the Company or the Company Subsidiaries to the extent proposed to be issued to any holder of Units or any of their respective Affiliates.  The provisions of Section 10.1(b) through Section 10.1(g) shall apply mutatis mutandis to this Section 10.2.  The Company shall cause the Company Subsidiaries to comply with the provisions of this Section 10.2.

Section 10.3    Registration Rights.  Prior to or upon any Public Offering by the Company of its securities, the Company shall grant registration rights to each Member, and the Company and the Members shall enter into a registration rights agreement providing in any case for such demand, piggy-back, underwriting, holdbacks, fees and expenses, registration statement, appropriate limitations on the number of such registrations and/or other registration rights as the Company and such Member may agree.

## ARTICLE XI
## EXCULPATION AND INDEMNIFICATION

Section 11.1    Exculpation of Covered Persons.

(a)    Covered Persons.  As used herein, the term "Covered Person" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Director, Officer, employee, agent or representative of the Company.

(b)    Standard of Care. **NO COVERED PERSON SHALL BE LIABLE TO THE COMPANY OR ANY OTHER COVERED PERSON FOR ANY LOSS, DAMAGE OR CLAIM INCURRED BY REASON OF ANY ACTION TAKEN OR OMITTED TO BE TAKEN BY SUCH COVERED PERSON IN GOOD-FAITH RELIANCE ON THE PROVISIONS OF THIS AGREEMENT, SO LONG AS SUCH ACTION OR OMISSION DOES NOT CONSTITUTE FRAUD, WILLFUL MISCONDUCT, BAD FAITH, GROSS NEGLIGENCE OR BREACH OF THE PROVISIONS OF THIS AGREEMENT BY SUCH COVERED PERSON**.

(c)    Good Faith Reliance. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, net income or net losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Director; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 of the TBOC.

Section 11.2    Liabilities and Duties of Covered Persons.

(a)    Limitation of Liability. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and

liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)  Duties. Unless expressly provided to the contrary in this Agreement, any action, consent, approval, election, decision or determination to be made by any Member or the Board under or in connection with this Agreement (including any act by such Member or the Board within its "discretion" under this Agreement and the execution and delivery of any documents or agreements on behalf of the Company), shall be in the sole and absolute discretion of such or the Board, as applicable. Whenever in this Agreement any Member or the Board is permitted or required to make a decision in "good faith," such Member or the Board, as applicable, shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

Section 11.3  Indemnification.

(a)  Indemnification. To the fullest extent permitted by the TBOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the TBOC permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs ("Losses"). A Covered Person shall not be entitled to indemnification under this Section 11.3 with respect to (i) **ANY LOSSES WITH RESPECT TO ANY CLAIM WITH RESPECT TO WHICH SUCH COVERED PERSON HAS ENGAGED IN FRAUD, WILLFUL MISCONDUCT, BAD FAITH OR GROSS NEGLIGENCE OR BREACH OF THE PROVISIONS OF THIS AGREEMENT**, (ii) any claim with respect to such Losses initiated by such Covered Person unless such claim (or part thereof) was brought to enforce such Covered Person's rights to indemnification hereunder or (iii) any income taxes or withholding taxes for which a Member is liable as a result of its ownership or disposition of Units.

(b)  Reimbursement. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 11.3; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 11.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)  Entitlement to Indemnity. The indemnification provided by this Section 11.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this

Section 11.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 11.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)     Insurance. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)     Funding of Indemnification Obligation. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 11.3 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(f)     Savings Clause. If this Section 11.3 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 11.3 to the fullest extent permitted by any applicable portion of this Section 11.3 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)     Amendment. The provisions of this Section 11.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 11.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 11.3 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 11.4    Survival.  The provisions of this Article XI shall survive the dissolution, liquidation, winding up and termination of the Company.

ARTICLE XIII
ACCOUNTING; TAX MATTERS

Section 13.1    Financial Statements.  The Company shall furnish to each Member the following reports:

46

(a)     <u>Annual Financial Statements</u>.  As soon as available, and in any event within ninety (90 days after the end of each fiscal year, audited consolidated balance sheets of the Company as at the end of each such fiscal year and audited consolidated statements of income, cash flows and Members' equity for such fiscal year, in each case setting forth in comparative form the figures for the previous fiscal year, accompanied by the certification of independent certified public accountants of recognized national standing selected by the Board in accordance with <u>Section 6.10(a)(xiii)</u>, certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of their operations and changes in their cash flows and Members' equity for the periods covered thereby.

(b)     <u>Quarterly Financial Statements</u>.  As soon as available, and in any event within forty-five (45) days after the end of each quarterly accounting period in each fiscal year (other than the last fiscal quarter of the fiscal year), unaudited consolidated balance sheets of the Company as at the end of each such fiscal quarter and for the current fiscal year to date and unaudited consolidated statements of income, cash flows and Members' equity for such fiscal quarter and for the current fiscal year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto), and certified by the principal financial or accounting officer of the Company.

(c)     <u>Monthly Financial Statements</u>.  As soon as available, and in any event within ten (10) days after the end of each monthly accounting period in each fiscal quarter (other than the last month of the fiscal quarter), unaudited consolidated balance sheets of the Company as at the end of each such monthly period and for the current fiscal year to date and unaudited consolidated statements of income, cash flows and Members' equity for each such monthly period and for the current fiscal year to date, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto).

Section 13.2   <u>Inspection Rights</u>.  Upon reasonable notice from a Member, the Company shall afford each Member and its Representatives access during normal business hours to (i) the Company's properties, offices, plants and other facilities; (ii) the corporate, financial and similar records, reports and documents of the Company, including, without limitation, all books and records, registers, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members, and to permit each Member and its Representatives to examine such documents and make copies thereof; and (iii) any officers, senior employees and public accountants of the Company, and to afford each Member and its Representatives the opportunity to discuss and advise on the affairs, finances and accounts of the Company with such officers, senior employees and public accountants (and the Company hereby authorizes said accountants to discuss with such Member and its Representatives such affairs, finances and accounts).

Section 13.3   <u>Income Tax Status</u>.  The Company has made a valid election pursuant to Treasury Regulations Section 301.7701-3 to be treated as a corporation for U.S. federal income

47

tax purposes.  The Company intends to be treated as a corporation for U.S. federal and applicable state and local income tax purposes and shall not make any election, under Treasury Regulations Section 301.7701-3 or otherwise, that is inconsistent with this intended treatment.

Section 13.4   Tax Returns.  At the expense of the Company, the Board (or any Officer that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company.

Section 13.5   Company Funds.  All funds of the Company shall be deposited in its name, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Board.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature of the President and Chief Executive Officer or the signature or signatures of such Officer or Officers as the Board may from time to time designate.

ARTICLE XIV
DISSOLUTION AND LIQUIDATION

Section 14.1   Events of Dissolution.  The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a)   The determination of the Members to dissolve the Company by unanimous written consent;

(b)   The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(c)   The entry of a decree of judicial dissolution pursuant to the TBOC.

Section 14.2   Effectiveness of Dissolution.  Dissolution of the Company shall be effective on the day on which the event described in Section 14.1 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 14.3 and the Certificate of Formation shall have been cancelled as provided in Section 14.4.

Section 14.3   Liquidation.  If the Company is dissolved pursuant to Section 14.1, the Company shall be liquidated and its business and affairs wound up in accordance with the TBOC and the following provisions:

(a)   Liquidator.  The Board, or if the Board is unable to do so, a Person selected pursuant to a Member Approval shall act as liquidator to wind up the Company (the "Liquidator").  The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   Accounting.  As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of

certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)     Distribution of Proceeds.   The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)     *First*, to the payment of (or the establishment of reserves for) all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation and distribution (including sales commissions incident to any sales of assets of the Company and any taxes for which the Company is liable as a result of the liquidation, distribution or otherwise);

(ii)     *Second*, to the establishment of and additions to reserves that are determined by the Board to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)     *Third*, to the Members *pro rata* in accordance with their respective Percentage Interests.

(d)     Discretion of Liquidator.  Notwithstanding the provisions of Section 14.3(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 14.3(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 14.3(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 14.4    Cancellation of Certificate.   Upon completion of the distribution of the assets of the Company as provided in Section 14.3(c) hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Texas and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company.

Section 14.5    Survival of Rights, Duties and Obligations.   Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.   For the avoidance of doubt, none of the

foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 11.3.

Section 14.6    Recourse for Claims.  Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company and shall have no recourse therefor (upon dissolution or otherwise) against the Liquidator or any other Member.

ARTICLE XV
MISCELLANEOUS

Section 15.1    Expenses.  Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 15.2    Further Assurances.   In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.3    Confidentiality.

(a)    Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information").  In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)    Nothing contained in Section 15.3(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the

MO\164117.21

request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Member; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 15.3 as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this Section 15.3 as if a Member; *provided*, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Member of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Member) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 15.3(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Member or any of their respective Representatives, *provided*, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 15.3 shall survive for so long as such Member remains a Member, and for  three (3) years following the earlier of (i) termination, dissolution, liquidation and winding up of the Company, (ii) the withdrawal of such Member from the Company, and (iii) such Member's Transfer of all of its Units.

Section 15.4    Notices.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered either (a) (i) personally (by hand), (ii) by an internationally recognized overnight courier (properly addressed, prepaid and return receipt requested), or (iii) by certified or registered mail (properly addressed, prepaid and receipt requested); *provided*, in the case of each of clauses (i), (ii) and (iii), that such delivery is also made by Electronic Transmission (with confirmation of transmission) or (b) by Electronic Transmission (with confirmation of transmission) only, to the following addresses (or at such other address for a party as shall be specified in a notice given by such party in accordance with this Section 15.4). Any such notice, request, consent, claim, demand, waiver or other communication shall be deemed delivered on the date of such facsimile and electronic mail transmission to the email address or facsimile number, as the case may be, provided for the relevant parties if sent during normal business hours of the recipient, or on the next Business Day if sent after normal business hours of the recipient; *provided*, that if the facsimile and electronic mail transmission are not on the same date, such delivery date shall be the later date of the respective transmissions.

If to the Company, then to:

American Ethane Company, LLC
365 Canal Street, Suite 2650
New Orleans, Louisiana  70130
Facsimile: (504) 522-2279
Phone:     (504) 522-2270
E-mail: dpacker@americanethane.com
Attention: Dan Packer, President and CEO

If to any Member, then to the notice address of such Member set forth in the Member Schedule.

Section 15.5   Headings.  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

Section 15.6   Severability.  If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 15.10, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.7   Entire Agreement.  This Agreement, together with the Certificate of Formation and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.8   Successors and Assigns.  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.9   No Third-party Beneficiaries.  Except as provided in Section 11.3, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.10  Amendment.  No provision of this Agreement or the Certificate of Formation may be amended or modified except in an instrument in writing executed by the Company and the Members holding at least 90% of the Units and approved by a resolution or written consent of such Members; *provided, however*, that notwithstanding the foregoing, no

MO\164117.21

such amendment or modification may be made (a) without the consent of any affected Member if such amendment or modification (i) would modify the limited liability of such Member in a manner adverse to any other Member, (ii) would increase the aggregate capital contributions required of such Member, (iii) would disproportionately adversely affect the rights of such Member pursuant to any of the provisions of Article IX, relative to the rights of any other Member, (iv) would have a materially disproportionate adverse effect on the rights or obligations of such Member relative to the rights or obligations of any other Member or the class of Units held by such Member relative to the Units held by any other Member, it being understood and agreed, however, that any amendment or modification required solely to reflect the admission of additional Members or the creation or issuance of New Interests or Units, in each case, in accordance with the applicable terms and conditions of this Agreement shall not constitute an amendment or modification requiring the consent of any affected Member under this <u>Section 15.10</u>; or (b) without the consent of the named Member if such amendment or modification would reasonably be expected to have an adverse effect on the rights or obligations of a named Member (in its capacity as a named Member and not in its capacity as a Member, generally); *provided, further*, that immaterial administrative amendments or modifications to this Agreement or the Certificate of Formation may be made as determined by the Board and without the consent of any Member.

Section 15.11 <u>Waiver</u>. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this <u>Section 15.11</u> shall diminish any of the explicit and implicit waivers described herein, including in <u>Section 15.14</u> hereof.

Section 15.12 <u>Governing Law</u>. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

Section 15.13 <u>Submission to Jurisdiction</u>. Each of the parties hereto irrevocably and unconditionally consents to submit to the non-exclusive jurisdiction of any state or federal court located in the city of New York, New York County, New York with respect to any dispute arising out of or relating to this Agreement, or the negotiation, validity or performance of this Agreement, or the transactions contemplated hereby.

Section 15.14 <u>Waiver of Jury Trial</u>. Each party hereto hereby acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right

53

it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.15  <u>Equitable Remedies</u>.   Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.16  <u>Attorneys' Fees</u>.   In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

Section 15.17  <u>Remedies Cumulative</u>.   The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in <u>Section 11.2</u> to the contrary.

Section 15.18  <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**COMPANY:**

AMERICAN ETHANE COMPANY, LLC

By:

Name: Daniel F. Packer
Title:   President and Chief Executive Officer

**MEMBER:**

LLC "ALTERNATIVE"

By:_____

Name: Ramil Zaynetdinov

Title: General Director

**MEMBER:**

AMSHALE ENERGY, LLC

By:_____

Name:

Title:

**MEMBER:**

ALEXANDER S. VOLOSHIN

By: _____

**EXHIBIT A**

**FORM OF JOINDER AGREEMENT**

This JOINDER AGREEMENT (this "Joinder") is executed as of **[_____]**, 20**[__]** by [*TRANSFEREE/SUBSCRIBER*] (the "New Member") pursuant to Section 7.1(a) of that certain Amended and Restated Limited Liability Company Agreement dated as of April 30, 2014 (as may be amended, restated, restated, supplemented or otherwise modified from time to time, the "Agreement"), by and among American Ethane Company, LLC (the "Company"), and the Persons identified on the Member Schedule thereto, which constitute all of the Members of the Company as of the date hereof. Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

**RECITALS**

**WHEREAS**, substantially simultaneously with the execution of this Joinder, the New Member is acquiring Units; and

**WHEREAS**, as a condition to its admission as a Member, the New Member has agreed to join as a party to the Agreement in accordance with Section 7.1(a) of the Agreement.

**NOW, THEREFORE**, as an inducement to the Members to permit the admission of the New Member as a Member, the New Member hereby agrees as follows:

**AGREEMENTS**

1.      **Joinder**.  The New Member hereby acknowledges that it has received and reviewed a copy of the Agreement, and agrees to (i) join as a party thereto as a Member and (ii) be bound by and comply with all provisions thereunder applicable to such New Member. Upon the Joinder Effective Date (as defined below), the New Member shall be deemed a Member under the Agreement and shall have the rights, and be subject to the obligations, of a Member pursuant to the Agreement.

2.      **Representations and Warranties**.  The New Member represents and warrants that (i) each representation and warranty contained in Section 7.2 of the Agreement, as it relates to the New Member in its capacity as a Member, is true and correct in as of the date hereof; (ii) its acquisition of Units is being made in compliance with all Applicable Laws; and (iii) it has delivered to all Members a true and complete copy of the instrument(s) pursuant to which it is acquiring Units in connection with this Joinder.

3.      **Effective Date**.  This Joinder shall be effective (the "Joinder Effective Date") as of the date of the satisfaction (or waiver in writing by all Members) of the requirements set forth in Section 7.1(a) of the Agreement.

4.      **Capital Contributions and Units**.  As of the Joinder Effective Date, the capital contributions, Percentage Interest and Units of the New Member, which shall be set forth on the Member Schedule of the Agreement as of the Joinder Effective Date, are as follows:

Exhibit A-1

| Capital Contribution | Percentage Interest | Units |
|---|---|---|
| [_____] | [_____] | [_____] |

5.      **Entire Agreement**.  This Joinder and the Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and oral, among the parties or any of them with respect to the subject matter hereof.

6.      **No Waiver**.  Except as expressly supplemented hereby, all provisions of the Agreement shall remain in full force and effect.

7.      **Notices**.  All communications and notices hereunder to or upon the New Member shall be given in accordance with Section 15.4 of the Agreement and shall be sent to the New Member as follows:

> [NEW MEMBER]
> [Address]
> [Address]
> Attention: [_____]
> E-mail: [_____]

8.      **Governing Law**.  All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Joinder shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

9.      **Severability**.  If any term or provision of this Joinder or the application thereof to any Person or circumstance is held to be invalid, illegal or unenforceable to any extent, the remainder of this Joinder and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

10.      **Further Assurances**.  In connection with this Joinder and the Agreement and the transactions contemplated hereby and thereby, the New Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be reasonably necessary or appropriate to effectuate and perform the provisions of this Joinder and the Agreement and the transactions contemplated hereby and thereby.

*[Signature page follows.]*

Exhibit A-2

     **IN WITNESS WHEREOF**, the undersigned has caused its duly authorized officer to execute and deliver this Joinder as of the date first written above.


**[NEW MEMBER]**

By:_____
       Name:
       Title:

Exhibit A-3

## EXHIBIT B

## FORM OF LLC INTEREST CERTIFICATE

LIMITED LIABILITY COMPANY INTEREST CERTIFICATE
AMERICAN ETHANE COMPANY, LLC

No. [___]

THIS CERTIFIES THAT [*MEMBER*] is the owner of [*NUMBER*] Units of American Ethane Company, LLC, a Texas limited liability company (the "Company"), in the capacity of a Member of the Company.

THE RIGHTS, POWERS, PREFERENCES, RESTRICTIONS (INCLUDING TRANSFER RESTRICTIONS) AND LIMITATIONS OF THE UNITS ARE SET FORTH IN, AND THIS CERTIFICATE AND THE UNITS REPRESENTED HEREBY ARE ISSUED PURSUANT TO AND SHALL IN ALL RESPECTS BE SUBJECT TO THE TERMS AND PROVISIONS OF, THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF APRIL 30, 2014, AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME (THE "AGREEMENT"). THE TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS CERTIFICATE AND THE UNITS REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE AGREEMENT.

Capitalized terms used and not otherwise defined herein are used as defined in the Agreement.

The Units represented by this Certificate is a security within the meaning of and governed by Article 8 of the Uniform Commercial Code as in effect in the State of Texas. This Certificate shall be governed by, construed, interpreted and applied in accordance with the laws of the State of Texas (excluding any conflict of law rules thereof).

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed this [*DAY*] day of [*DATE*].

By: _____

Name:  [*NAME*]

Title:   [*AUTHORIZED OFFICER*]

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS, AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER. THIS SECURITY IS SUBJECT TO THE PROVISIONS OF THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

(REVERSE OF CERTIFICATE)
ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby assigns, conveys, sells and transfers unto

_____     _____

(Insert taxpayer identification number     (Print name and address)
of Assignee)

all rights and interest of the Assignor in American Ethane Company, LLC represented by the within Certificate and irrevocably constitutes and appoints _____ as its attorney-in-fact with full power of substitution in the premises to transfer the same on the books of the Company.

Dated: _____     By: _____

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS, AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER. THIS SECURITY IS SUBJECT TO THE PROVISIONS OF THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

Exhibit B-2

## SCHEDULE I

## MEMBER SCHEDULE

| Member Name and Address | Percentage Interest | Units |
|---|---|---|
| LLC "Alternative"<br><br>LLC "Alternative"<br>Bld. 39, str. 1, ul. Nizhnyaya Krasnoselskaya<br>Moscow, Russian Federation, 105066<br>Facsimile: +7 (915) 642-9637<br>Email:    notices@invest-ag.ru<br>Attn:      General Director | 50.00% minus 1 Unit | 24,999,999 |
| Amshale Energy, LLC<br><br>Amshale Energy, LLC<br>2323 South Shepherd Drive<br>Suite 800<br>Houston, Texas 77019<br>Fax:  832-494-1671<br>Email: John@ghwlegal.com<br>Attn:  John Houghtaling, II | 47.50% | 23,750,000 |
| Alexander S. Voloshin<br><br>Alexander S. Voloshin<br>23 Bolshaya Polyanka<br>Moscow 119180<br>Russia<br>Facsimile: +7 (495) 728-4971<br>Email:    asv@mcom.com<br>Attn:      Alexander S. Voloshin | 2.50% plus 1 Unit | 1,250,001 |
| **Total:** | 100% | 50,000,000 |

**SCHEDULE II**

**OFFICERS**

| Name | Office |
|---|---|
| Daniel F. Packer | President and Chief Executive Officer |
| Raymond Ballard | Secretary |

MO\164117.21

# SCHEDULE III

## PERMITS

1. U. S. Army Corp of Engineers 404 dredge and fill permit
2. U. S. Army Corp of Engineers ENG form 4345
3. EPA/State of Louisiana air permit
4. Part 70 (Title V) Operating
5. General Part 70 (Title V) Operating
6. Prevention of Significant Deterioration (PSD)
7. Nonattainment New Source Review (NNSR)
8. State (Minor Source)
9. State Minor Source General Permit
10. EPA 316B water intake permit
11. Louisiana Storm Water Construction
12. NPDES National Pollution Discharge Elimination System (Louisiana LPDES)
13. Louisiana DNR Pipeline permit
14. Local Construction permits at Shady Grove and along the pipeline route
15. The Berth permission
16. The FERC (Federal Energy Regulatory Commission) Pipeline filing
17. Other agreements and permits which are required for construction and commercial operation of the Facility

MO\164117.21